Commonwealth *v.* Moses, Appellant.

Submitted March 15, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BAR-BIERI, JJ.

*John J. Dean* and *A. M. Cohen,* Assistant Public Defenders, and *George H. Ross,* Public Defender, for appellant.

*Carol Mary Los,* Assistant District Attorney, and *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, December 31, 1971:

The appellant, Leonard Moses, was convicted by a jury of murder in the first degree, and punishment was fixed at life imprisonment. After denial of motions in arrest of judgment and/or a new trial, sentence was imposed by the court as the jury directed. This appeal was then filed.

The sufficiency of the trial evidence to support the jury's verdict is not questioned; nevertheless, we have studied the record and are satisfied the evidence is ample enough to sustain a finding of guilt of murder in the first degree. Therefrom, the jury could find the following facts.

About 3 p.m. on April 5, 1968, a group of black youths, including the appellant Moses, were observed placing a white chalk mark on the outside of a house in Homewood, Allegheny County, wherein Mrs. Mary Amplo, a white woman and members of her family resided.[1] About 9 p.m., on April 6th, Moses and several other youths, including a William Murphy, returned to the Amplo address and Moses and another youth in the group each threw a homemade firebomb at the house. One of the bombs entered the building through the window of the living room, causing it to be immediately enveloped in flames.[2] Mrs. Amplo, who was in the living room watching television, suffered severe burns over fifty-five percent of her body from which complications developed causing her death.

---

[1] It may just be a coincidence, but this was the day following the dastardly assassination of one of this Nation's finest citizens, the distinguished Dr. Martin Luther King.

[2] During his trial testimony, Moses admitted being present when the Amplo house was firebombed. However, he said a single bomb was thrown by William Murphy and that he and the others had no prior knowledge Murphy was carrying a bomb or had the intention to use it.

At trial, evidence of oral admissions and an incriminating recorded statement made by Moses to the police was admitted over objection.[3] This is the prime assignment of error. The Commonwealth's testimony as to the circumstances under which this evidence came into existence may be summarized as follows.

After the senseless crime involved, the police worked for months in an effort to ascertain its perpetrators. Finally, in November 1968, based on information recently received from one of the youths present at the time of the firebombing, a warrant issued charging Moses with murder. In seeking Moses out, the police learned that he was then a resident of the Auberle Home for Boys in McKeesport, Pennsylvania, and three officers were directed to proceed to the Home to take him into custody. Before traveling to the Home, these officers contacted an authority at the institution by phone and informed him of their intended visit and purpose. When the officers arrived about 11 p.m., they first met with three social workers of the Home and explained the nature of the criminal charge lodged against Moses. The latter was then brought into the room where the officers and the representatives of the institution were gathered. Moses was immediately informed why the officers were there, and one of the social workers, a Mr. Denman, then said he "wanted to question the boy". The officers readily assented, but suggested the questioning occur outside of their presence and hearing in order that no possible violation ensue of Moses' constitutional rights. Mr. Denman and another social worker then took Moses into another room. A few minutes later when they emerged, Moses was taken onto police custody.

---

[3] A timely motion to suppress this evidence was denied after a pre-trial hearing.

Immediately upon entering the automobile which transported the group back to Pittsburgh, one of the officers again advised Moses that he was charged with the arson-murder of Mrs. Amplo and advised him of all of his constitutional rights, including his right to remain silent and his right not to answer any questions unless a lawyer was present to assist him. When the officer started to further "discuss" these rights, Moses said, "I know my rights, I know my rights". During the ride back to Pittsburgh, nothing further was said about the crime involved.

The group arrived at police headquarters in Pittsburgh at 11:42 p.m., and about ten minutes later, after again advising Moses of his constitutional rights as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), one of the officers, who accompanied him from McKeesport, began to question Moses concerning the Amplo firebombing. Without hesitation, Moses proceeded to tell the officer of the firebombing and the part he played therein.[4] At 12:12 a.m., the officer proceeded to have Moses' admissions recorded or to take "a formal statement". The officer's questions and Moses' answers were recorded on a typewriter. When this was completed at 1:42 a.m., Moses read the statement, signed it at the end and initialed each page. At the time, Moses was sixteen years of age and did not have the assistance of counsel.

In challenging the propriety of the evidentiary use of Moses' incriminating oral admissions and written statement at trial, the sole contention of the appellant is that the right to counsel guaranteed by the Sixth

[4] In part, Moses said, that he and the other youths joined in preparing the firebombs by filling pop bottles with gasoline taken from an abandoned automobile and placing wicks in the bottles; and that they then proceeded to the Amplo residence, lit the wicks and threw the bombs at a window of the building.

Amendment to the United States Constitution requires "that counsel be present when a juvenile confesses to a capital crime". It is not asserted that Moses was not fully and clearly advised of all of his constitutional rights before he incriminated himself. But, it is argued that a "juvenile lacks the ability" to fully understand and assert his constitutional rights and, hence cannot effectively waive such rights without the advice of a more mature person. We emphatically reject such a prophylactic rule, particularly where a sixteen-year or seventeen-year-old is concerned.

It is true that, in determining whether incriminating statements of an accused were voluntarily given and whether or not he intelligently waived his constitutional rights, all of the attending circumstances must be considered, including the age, maturity and intelligence of the individual involved. See *Commonwealth v. Darden*, 441 Pa. 41, 271 A. 2d 257 (1970), and *Commonwealth v. Taper*, 434 Pa. 71, 253 A. 2d 90 (1969). Cf. also, *United States ex rel. Loray v. Yeager*, 446 F. 2d 1360 (3d Cir. 1971). And where the accused is of tender years, the attending circumstances must be scrutinized with special care. However, to declare as a matter of law that a sixteen-year-old, regardless of maturity and intelligence, is unable to fully understand when he is informed of his constitutional rights and may not by himself waive his right to counsel before being questioned by the police would be to ignore reality and the sophistication of the average sixteen-year-old in these days and times.

In support of his position, appellant cites *Gallegos v. Colorado*, 370 U.S. 49, 82 S. Ct. 1209 (1962), and *Haley v. Ohio*, 332 U.S. 596, 68 S. Ct. 302 (1948), but these cases did not enunciate the rule appellant advances.

In each of the cases cited, the court ruled that incriminating statements of the defendants were erroneously admitted at trial because the *totality of the circumstances* compelled the conclusion that the statements were involuntarily given.[5] In neither case did the Court state that an uncounseled fifteen-year-old may not waive his right to counsel as a matter of law, nor was it held that due process proscribes the evidentiary use of incriminating statements made by such an individual in the absence of legal counsel or other mature person. While there is language in both opinions which lends comfort to appellant's position, it should not be read out of context or without consideration of the facts these cases presented.

We have carefully scrutinized all of the circumstances attending Moses' incriminating statements and are not persuaded that the trial court committed error in failing to rule this evidence inadmissible as a matter of law. Moses was a tenth-grade student at the time the challenged evidence was obtained and enjoyed at least average intelligence, as indicated by his testimony in the trial court proceedings. He testified during the pretrial suppression hearing and at trial, and in neither instance did he deny receiving warnings of his constitutional rights before incriminating himself, nor did he say he failed to understand these warnings. Whether Moses intelligently waived his right to counsel was for the trier of the facts.

It is next maintained that the evidence was insufficient as a matter of law to establish beyond a reason-

---

[5] In *Gallegos*, the fifteen-year-old defendant was held incommunicado for five days before he confessed and during this period the efforts of his mother to see him were repulsed by the police. In *Haley*, the fifteen-year-old defendant was interrogated continuously for five hours by relays of policemen before he confessed and at no time was he advised of his right to remain silent.

able doubt that Mrs. Amplo's death was caused by injury suffered in the blaze resulting from the firebombing. This issue was considered and rejected in a co-defendant's appeal. See *Commonwealth v. Johnson*, 445 Pa. 276, 284 A. 2d 734 (1971).

The remaining assignments of error have been considered and found to be without merit.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

The record in this case and controlling law—both constitutional and decisional—as well as established police practices and the widely shared views of commentators join everyday common experience and simple justice in urgently compelling dissent from the majority's refusal to grant relief.

The majority holds that Leonard Moses, a sixteen-year-old boy with no prior experience with the law, taken some time after 11 p.m. by the police from the charitable home for boys where he resided and placed in a police car alone with three policemen, there "knowingly and intelligently" made the judgment to surrender both his constitutional right to remain silent and his constitutional right to the assistance of counsel, with the result that the police interrogated him at their "unsupervised pleasure"[1] and secured a confession admitted at trial over objection which convicted him of murder.

The majority reached its conclusion by purporting to rely on the "totality of the circumstances" test which we adopted in *Commonwealth v. Darden*, 441 Pa. 41, 271 A. 2d 257 (1970), for determining the effectiveness of juveniles' waiver of their *Miranda* rights. However, upon analysis, it becomes clear that the sole basis of

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 466, 86 S. Ct. 1602, 1624 (1966).

the majority's finding of an effective waiver was a new *pronunciamento,* "the sophistication of the average sixteen-year-old in these days and times".

The majority's reliance on this alleged sophistication is impermissible for two reasons. First, the assumption is intrinsically unsound. It has been contradicted by virtually every other authority that has been called upon to determine the capacity of juveniles to make the legally binding judgment that is involved here.[2] Second, by relying on this invalid assertion, the majority creates a per se rule which violates our constitutional obligation to make a case by case determination of whether a "knowing and intelligent" waiver occurred. *Miranda v. Arizona,* 384 U.S. 436, 475-76, 86 S. Ct. 1602, 1628-29 (1966) ; *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938).

The majority relies primarily on two factors in its purported application of *Darden's* totality of the circumstances approach: (1) the fact that Moses was a sixteen-year-old tenth grade student on the date in question; and (2) its assertion that Moses "enjoyed at least average intelligence, as indicated by his testimony in the trial court proceedings."[3]

---

[2] See pp. 8-20.

[3] The majority also attempts to bolster its conclusion by pointing out that Moses never testified that "he failed to understand these warnings." The majority thus ignores the Supreme Court's holding in *Miranda* that the burden is on the *government* to prove that the defendant knowingly and intelligently waived his *Miranda* rights. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon the *government* to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S. Ct. 1758, 1764, 12 L. Ed. 2d 977." *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S. Ct. 1602, 1628 (1966) (emphasis added).

Though it is clear that Moses was sixteen years old and a tenth grade student on the day in question, I disagree with the majority's assertion that Moses "enjoyed at least average intelligence". In the first place, I do not believe that the majority, merely by reading the notes of Moss' testimony at trial, can draw any realistic or reliable conclusions concerning Moses' "intelligence". In the second place, the waiver whose effectiveness is disputed took place in November, 1968, and Mose's suppression hearing and trial were not held until eight months later. I do not believe that Moses' testimony, in a courtroom and with the guidance and assistance of an attorney, can be related back to determine Moses' intelligence at the time that he was interrogated.

The majority reasons as follows. First it makes the unsupported assertion that "the average sixteen-year-old in these days and times" is sufficiently "sophisticated" to have the capacity to make a knowing and intelligent waiver of his *Miranda* rights without at least some advice from "a more mature person". The majority then points to Leonard's status as a sixteen-year-old tenth grader and their assumption of his "average intelligence", and concludes that Leonard is an "average sixteen-year-old". Therefore, the majority further concludes, Moses made a knowing and intelligent waiver. while alone with the three policemen in the police car.

Even if I were convinced—and I am not—of the intrinsic soundness of the majority's assertion that the "average sixteen-year-old" has the capacity to make a knowing and intelligent waiver of his *Miranda* rights, without the advice of an adult, I would still regard the majority's conclusion as constitutionally impermissible. For even if it is conceded that Leonard was generally of "average intelligence", he may have been below the average of sixteen-year-old tenth graders in the particu-

lar capacity of judgment that is required for an effective waiver—the capacity to knowingly and intelligently waive *Miranda* rights. In fact, as the United States Supreme Court recognized in *Johnson v. Zerbst,* supra, the capacity to make a knowing and understanding waiver of *Miranda* rights is as much a function of the accused's particular "background" and "experience" as of his intelligence.[4] And there is nothing in the record to indicate that Moses' background and experience developed the capacity to knowingly and intelligently waive *Miranda* rights. Indeed, the record establishes that Moses had no prior contacts with the law. Moreover, the majority's reasoning ignores the fact that a youth's capacity to make a knowing and intelligent waiver may vary with the circumstances at the time and place that the waiver is alleged to have occurred.

A finding of waiver of *Miranda* rights cannot be sustained on the basis of the "average" capacity of a class to which the defendant may belong. A finding of waiver of these federal constitutional rights can rest only on the basis of an individualized analysis of each defendant's particular capacity, in the particular circumstances of the case, to make a knowing and understanding waiver. As the United States Supreme Court stated in *Johnson v. Zerbst* : "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights'. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. *The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts*

---

[4] *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938).

*and circumstances surrounding that case, including the background, experience, and conduct of the accused."* Id. at 464, 58 S. Ct. at 1023 (emphasis added) (citations omitted).

The majority's "emphatic rejection" of a prophylactic or per se rule is a *non-sequitur*. For what the majority has done is to create a per se rule that any sixteen-year-old, who is generally of "average intelligence", regardless of his particular capacity to understand his *Miranda* rights and appreciate the significance of waiver, and regardless of the particular circumstances at the time and place that the waiver is alleged to have been effected, will be found to have made a knowing and intelligent waiver.

Only by ignoring both the record and reality can the majority conclude that effective waiver occurred when the police placed this sixteen-year-old in the squad car with three policemen and in that coercive setting recited to him pro forma his *Miranda* warnings. Upon review of the record, I find nothing to support an effective waiver.

Present at the time of arrest at the charitable boy's home were three adult social workers: Father Sherwin, Mr. Walter Crocker, and Mr. Denman. These adults were actively interested in the youth's welfare, and Mr. Denman enjoyed the boy's complete confidence. In the presence of the three social workers the police officers had an opportunity to inform the youth of his constitutional right to remain silent and the right to counsel. Indeed, Mr. Denman asked the police officers if the interrogation of the juvenile could take place in their presence.

This request was denied. The police stated to the adults that any questioning of the boy at that time would violate his constitutional rights and instead waited until the boy was in the squad car with three

police officers before giving him the warnings.[5] The statement made to the boy's guardians by the police was legally incorrect and highly misleading. If it was meant to suggest that the interrogation of a juvenile was constitutionally required to be a clandestine affair, it was a clear misstatement of the law. The Supreme Court in *Miranda* specifically stressed that an "[o]pportunity to exercise" the *Miranda* rights "must be afforded [defendant] throughout the interrogation." 384 U.S. 436, 479, 86 S. Ct. 1602, 1630. Certainly this sixteen-year-old would have had a reasonable "[o]pportunity to exercise" his rights while in the company of his guardians but the thirty-minute police car custody afforded the accused virtually no "[o]pportunity to exercise" his rights. Additionally, the police offficer's statement to the guardians effectively discouraged or even precluded the adults from being present or seeking access to the youth during police interrogation. Cf. *Commonwealth v. Harmon,* 440 Pa. 195, 269 A. 2d 744 (1970), where in sustaining the suppression of a juve-

---

[5] The police officer's refusal to advise Leonard of his constitutional rights while in the presence of an adult was inconsistent with the general police practice in most metropolitan areas in our Commonwealth. See the discussion on pp. 16-20.

Nor should Leonard's failure to request help while in police custody be construed as a constitutional waiver of the protective guarantees required by *Miranda.* The California Supreme Court, dealing with a similar case involving a sixteen-year-old minor, recently observed: "lt is fatuous to assume that a minor in custody will be in a position to call an attorney for assistance. . . ." *People v. Burton,* 6 C. 3d 375, , 491 P. 2d 793, 797 (1971). It is as totally unrealistic to expect a sixteen-year-old to ask for "a lawyer" while in police custody. Such a requirement completely subverts the clear *Miranda* mandate and "would certainly severely restrict the 'protective devices' required by Miranda in cases where the suspects are minors if the only call for help which is to be deemed an invocation of the privilege is the call for an attorney." *People v. Burton,* 6 C. 3d 375, , 491 P. 2d 793, 797 (1971).

nile's confession this Court held that by refusing the boy's parent, attorney, and adult friend access to the boy during interrogation the police used "tactics in the securing of the challenged statement which we cannot condone". Id. at 199, 269 A. 2d at 746.

The abrupt shift from the charitable home for boys to the police car was geographically slight but psychologically and consequently legally significant. Had the police but taken advantage of the opportunity presented in the Home to advise Leonard of his *Miranda* rights, there would have been a greater likelihood of an intelligent and understanding waiver, since Leonard would have been able to draw upon the maturity and experience of the adults present.

The limited discussion of authority by the majority ignores the principles of case law, the views of responsible commentators, and established police practices, all of which mandate a careful scrutiny of the circumstances in which a juvenile's confession is secured and recognize the need for some adult guidance to insure a proper waiver of constitutional rights.

The strict standard for determining whether there has been an effective waiver of constitutional rights was first enunciated in *Johnson v. Zerbst,* 304 U.S. 458, 58 S. Ct. 1019 (1938), where the Supreme Court declared: "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." Id. at 464, 58 S. Ct. at 1023; *Carnley v. Cochran,* 369 U.S. 506, 513, 82 S. Ct. 884, 888 (1962) ; *Commonwealth v. Anderson,* 441 Pa. 483, 486, 272 A. 2d 877, 878 (1971) ; *Commonwealth v. Singleton,* 439 Pa. 185, 188-89, 266 A. 2d 753, 754 (1970). This standard was applied to in-custody interrogation waivers in *Miranda v. Arizona,* supra.

On this record it is clear that to sustain the validity of "the most compelling possible evidence of guilt, a

confession", which was "obtained" from this sixteen-year-old accused "at the unsupervised pleasure of the police" would only serve to render the subsequent proceedings "empty formalities."[6] Only by guaranteeing effective waiver of constitutional rights during police interrogation can the integrity of the subsequent proceedings be preserved.

The need to assure a constitutionally valid waiver has been recognized as especially acute in the area of juveniles. As far back as 1947 the United States Supreme Court observed in *Haley v. Ohio,* 332 U.S. 596, 68 S. Ct. 302: "Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. . . . No lawyer stood guard to make sure that the police went so far and no further, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning." Id. at 599, 68 S. Ct. at 304.

In holding that a mere formal recitation of constitutional rights did not render the minor defendant's subsequent confession voluntary, the Court explicitly rejected the assumption: ". . . that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice." Id. at 601, 68 S. Ct. at 304.

This same constitutional imperative was reaffirmed in *Gallegos v. Colorado,* 370 U.S. 49, 82 S. Ct. 1209 (1962). In determining that the confession elicited by

---

[6] *Miranda v. Arizona,* 384 U.S. 436, 466, 86 S. Ct. 1602, 1624 (1966).

the police from a fourteen-year-old boy was involuntary the Court said: "He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights." Id. at 54-55, 82 S. Ct. at 1212-13.

Again in *In Re Gault*, 387 U.S. 1, 87 S. Ct. 1428 (1967), the Court cautioned special scrutiny in the receipt of an admission made by a juvenile not in the presence of counsel: "If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (Citations omitted.) Id. at 55, 87 S. Ct. at 1458. The Court cited with approval a recommendation by the President's Commission on Law Enforcement and Administration of Justice that in order to assure " 'procedural justice for the child,' it is necessary that 'Counsel . . . be appointed as a matter of course wherever coercive action is a

possibility, without requiring any affirmative choice by child or parent.' "[7]

In determining whether this sixteen-year-old knowingly waived his right to counsel we should compare the circumstances of this purported waiver with the protection and careful explanation by the court of the value of counsel given to *adults* when adults seek to make an in-court waiver of counsel. The ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services §7.3 (Approved Draft 1968), provide the following directives for achieving a constitutional in-court waiver of counsel. "No waiver of counsel should be accepted unless it is in writing and of record. *If a person who had not seen a lawyer indicates his intention to waive the assistance of counsel, a lawyer should be provided to consult with him. No waiver should be accepted unless he had at least once conferred with a lawyer.* If a waiver is accepted, the offer should be renewed at each subsequent stage of the proceedings at which the defendant appears without counsel." (Emphasis added.) The United States Supreme Court in *Coleman v. Alabama,* 399 U.S. 1, 90 S. Ct. 1999 (1970), acknowledged "[t]he inability of the indigent accused on his own to realize [the] advantages of a lawyer's assistance" and went on to carefully articulate the values of counsel during "any pretrial confrontation". Surely this accused suffers at least the same "inability . . . on his own to realize [the] advantages of a lawyer's assistance."

It must be obvious from this record that the need for at least some adult guidance for this sixteen-year-old accused in "deciding" whether to waive counsel

---

[7] *In Re Gault,* 387 U.S. 1, 38, 87 S. Ct. 1428, 1449, quoting from the Report by the President's Commission on Law Enforcement and Administration of Justice, "The Challenge of Crime in a Free Society" (1967) at 86-87.

was certainly as imperative as that of an adult who stands before the court. Once this accused "decided" in the police car to waive his right to counsel and a confession was secured, he had "let the cat out of the bag". *United States v. Bayer,* 331 U.S. 532, 540, 67 S. Ct. 1394, 1398 (1947). In doing so he had realistically and effectively limited the professional ability of subsequent counsel to do any more than challenge the validity of the confession, which is precisely the relief being sought here. The Supreme Court must have envisioned this or similar factual situations when it prophetically said: "Without the protections flowing from adequate warning and rights of counsel, 'all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, *would become empty formalities,* in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police'." *Miranda v. Arizona,* 384 U.S. 436, 466, 86 S. Ct. 1602, 1624 (quoting from *Mapp v. Ohio,* 367 U.S. 643, 684, 81 S. Ct. 1684, 1707 (1961) (HARLAN, J., dissenting) (emphasis added).[8]

Many other states have held confessions of juveniles obtained in the absence of adult guidance to be involuntary. In New York the courts exclude all confessions made by a juvenile not in the presence of his parents or counsel. These decisions reason that such an approach is constitutionally mandated in *In Re Gault,*

---

[8] **The Third Circuit Court of Appeals in *United States ex rel. Loray v. Yeager,* 446 F. 2d 1360-61 (3d Cir. 1971), seemed to indicate that a minor must have the guidance of a parent or adult friend when the *Miranda* warnings are administered: "On the other hand, the 16-year-old prisoner was not advised of his right to remain silent or to have the assistance of counsel. He was given no opportunity to consult with parents or adult friends. Had this occurred after the Miranda and Escobedo decisions, the resultant confession would have been inadmissible."**

supra, and also rely on provisions in the Family Court Act that require a child to be delivered to the court or the detention facility "without his first being taken to the police station house".[9] See *In Re William L.*, 29 A.D. 2d 182, 287 N.Y.S. 2d 218 (1968) ; *In the Matter of Richard W.*, 29 A.D. 2d 873, 288 N.Y.S. 2d 380 (1968) ; *In Re Aaron D.*, 30 A.D. 2d 183, 290 N.Y.S. 2d 935 (1968). Other states with comparable statutes have interpreted them in a similar fashion. See, e.g., *State v. Arbeiter*, 408 S.W. 2d 26 (Mo. 1966) ; *Frye v. Gladden*, 1 Or. A. 629, 465 P. 2d 716 (1970) ; *State v. Shaw*, 93 Ariz. 40, 378 P. 2d 487 (1963). See generally, Glen, Interrogation of Children : When Are Their Admissions Admissible?, 2 Fam. L.Q. (1968).[10]

The New Jersey Supreme Court has held that confessions given by thirteen- and fifteen-year-old boys whose parents were denied access to their sons during police interrogation were involuntary. *In Re State In Interest of Carlo*, 48 N.J. 224, 225 A. 2d 110 (1966). That court rejected the prosecutor's argument that the confessions were voluntary because they had been preceded with a recitation of the juvenile's constitutional rights: "However, it seems doubtful that these

---

[9] Family Court Act, §724(b) (ii) (McKinney 1963).

[10] Some states have responded to the situation with legislation which specifically prohibits the usage of a confession or admission made by a minor not in the presence of an adult. See, e.g., 10 Okla. Stats. Supp. §1109; Colorado's Children Code, §22-2-2(3)(c) : "No statements or admissions of a child made as a result of interrogation of the child by a law enforcement official concerning acts which would constitute a crime if committed by an adult shall be admissible in evidence unless a parent, guardian, or legal custodian of the child was present at such interrogation, and the child and his parent, guardian, or legal custodian were advised of the child's right to remain silent, that any statements made may be used against him in a court of law, the right of the presence of attorney during such interrogation, and the right to have counsel appointed if so requested at the time of interrogation."

boys, age 15 and 13, had the mental capacity, particularly in the environment of a police station, to appreciate the extent of their rights and the consequences of a failure to exercise them (citing *Haley v. Ohio,* supra)." Id. at 241-42, 225 A. 2d at 120. For a similar result see *Daniels v. State of Georgia,* 226 Ga. 269, 174 S.E. 2d 422 (1970), where the Georgia Supreme Court held that *In Re Gault* had been violated where the mother was intoxicated when the *Miranda* warnings were given to her son. In a recent Rhode Island case, *In Re Juvenile,* R.I. Fam. Ct. (1971), a minor's confession not given in the presence of a parent or counsel was held involuntary even though the minor had misrepresented his age to the police. The court first noted that the state of Rhode Island had adopted a version of the Department of Health, Education and Welfare standards for questioning juveniles which require, inter alia, that the parents of a juvenile be informed of the child's rights before questioning.[11] The court also observed that the identification proferred by the boy was patently fraudulent and held that the police should have realized that they were dealing with a minor.

The need for adult guidance when juveniles are called upon to decide whether to surrender their *Miranda* rights has been universally recognized by leading commentators.[12] Dealing specifically with the issue of

---

[11] "Before being interviewed, the child and his parents should be informed of his right to have legal counsel present and to refuse to answer questions if he should so decide." Standards for Specialized Courts Dealing with Children, prepared by Children's Bureau, U. S. Department of Health, Education, and Welfare in cooperation with National Probation and Parole Association and the National Counsel of Juvenile Court Judges, (1954) at 38.

[12] Most commentators have interpreted *In Re Gault* as requiring parent or counsel present when a juvenile is informed of his constitutional right to remain silent and right to counsel. See, e.g.,

whether a minor can, by himself, waive his right to silence and right of counsel, the Model Rules for Juvenile Courts, promulgated by the Council of Judges of the National Council on Crime and Delinquency state unequivocally: "No extrajudicial statement by the child to a peace officer or court officer shall be admitted into evidence unless it was made in the presence of the child's parent or guardian or counsel. No such statement shall be admitted into evidence unless the person offering the statement demonstrates to the satisfaction of the court that, before making the statement, the child and his parents were informed and intelligently comprehended that he need not make a statement, that any statement made might be used in a court proceeding, and that he had a right to consult with counsel before or during the making of a statement."[13] The ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services provides: "No waiver should be found to have been made where it appears that the accused is unable to make an intelligent and understanding choice because of his mental conditions, *age,* education, experience, the nature or complexity of the case or other factors." (Emphasis

Altman, The Effect of the Miranda Case on Confessions in the Juvenile Court, 5 Am. Crim. L. Q. 79, 83 (1967) ; Ketcham, Guidelines from Gault: Revolutionary Requirements and Reappraisal, 53 Va. L. Rev. 1700, 1712 (1967) ; Paulsen, The Constitutional Domestication of the Juvenile Court, 1967 S. Ct. Rev. 233, 250; Welch, *Kent v. United States* and *In Re Gault*: Two Decisions in Search of a Theory, 19 Hast. L.J. 29, 42-43 (1967) ; Comment, Criminal Offenders in the Juvenile Court: More Brickbats and Another Proposal, 114 U. Pa. L. Rev. 1171, 1181-84 (1966) ; Note, Juvenile Delinquents: The Police, State Courts and Individualized Justice, 79 Harv. L. Rev. 775, 780-81 (1966).

[13]Council of Judges of the National Council on Crime and Delinquency, Model Rules for Juvenile Courts, Rule 25 Evidence (1969) at 53.

added.)[14] This Court has heretofore expressed its concern over the absence of counsel, parent, or adult friend in determining whether a minor's waiver of constitutional rights was knowing and intelligent. In *Commonwealth v. Darden*, 441 Pa. 41, 48, 271 A. 2d 257, 260 (1970), we acknowledged that in ascertaining whether a sixteen-year-old boy was aware of his constitutional rights ". . . he cannot be judged by the more exacting standards of maturity" and indulged in a ". . . very careful study of all of the circumstances disclosed by the record. . . ." Even more in point is *Commonwealth v. Harmon*, 440 Pa. 195, 269 A. 2d 744 (1970), involving the admissibility of a confession of an eighteen-year-old boy. During the period of his interrogation the police denied the defendant's mother, an attorney from the Public Defender's Office, and an adult friend from the Commission of Human Relations, access to the youth. Noting that the record disclosed "the use of tactics in the securing of the challenged statement that we cannot condone" this Court unanimously affirmed the trial court's ruling that the confession was involuntary. Id. at 199, 269 A. 2d at 746.

In addition to violating our constitutional mandate and earlier decisions of our Court, the majority's decision also conflicts with existing police practices in the metropolitan areas of the Commonwealth. The police are generally instructed by their official operations manuals to defer the questioning of juveniles until their parents or counsel are present. See Juvenile Court Judge's Commission, Juvenile Court Handbook, p. v (Supp. 1970). The forward to the 1970 edition notes that the standards promulgated by the Commission

---

[14] ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services, §7.2 Waiver (Approved Draft 1968) at 63.

have been used by ". . . judges, probation officers, police, social workers. . . ." The section on police interrogation of minors advises, inter alia, ". . . great care should be exercised by the police to ascertain that the child and his parents fully comprehend the child's constitutional rights in order that there be an effectual and intelligent waiver of such rights. . . . Unless such constitutional warnings are given and intelligently and understandingly waived by the child *and his parents,* no statement or admission can be used against him in an adversary proceeding." (Emphasis added.) Similarly the Police Guidance Manual on Juvenile Delinquency, prepared by Professors Louis B. Schwartz and Stephen R. Goldstein of the University of Pennsylvania Law School for use by the Philadelphia Police Force and as a model for metropolitan police forces generally, advises: ". . . the juvenile gets more protection in some ways against police questioning than an adult gets . . . the youngster's 'consent' to answer questions may not be enough to legalize if it [sic] he is too young to realize the risk and consequences, or if his parents or lawyer are not present. Even offer of a lawyer's services and formal warning that answers may be used against him may not be enough in the case of an ignorant young child."[15] In accord is the Standard Operational Procedure for Juvenile Division of the Erie Police: "No state-

---

[15] Police Guidance Manual No. 9, Juvenile Delinquency, §10 Questioning Juveniles at 20-21. The Juvenile Aid Division Investigators Manual of the Philadelphia Police Department provides: "Parents or guardians should be notified as soon as possible in every case when a child is taken into custody. . . ." In similiar language p. 21 of Chapter VIII of the Harrisburg Police Department Manual relating to policy and procedures in the interrogation of juveniles requires: "If the child is *less than eighteen years of age,* no statement . . . shall be elicited . . . unless . . . parents or his guardian has first been informed . . . and has given their explicit permission for such interview." (Emphasis in original.)

ment shall be taken from a child unless one of his parents or guardians has first been informed of the matter on which the interview is to take place and has given his specific permission for such interview."

The Pennesylvania State Police and the Federal Bureau of Investigation have exhibited equal concern for the constitutional rights of juveniles: "Prior to iniating an interview, the investigating officer shall inform the child's parents and/or the child of his Constitutional right to remain silent and of his right to counsel, appointed or retained. This procedure shall be followed regardless of the intelligence of the child and regardless of the absence or the presence of parents or parental permission for the interview."[16] The Pittsburgh Police, involved in this case, are operating under a manual that predates the *Escobedo* and *Miranda* opinions. See Police Manual Regulations for Handling Juveniles, Pittsburgh Bureau of Police, Pittsburgh, Pennsylvania, effective June 1, 1962. Even in such a dated publication the manual instructs the police to notify the parents or guardians of an arrested minor as soon as possible. Presumably the rationale of such a requirement is to permit the minor to consult with a friendly and experienced adult before making critical decisions. It must be recognized that such manuals are of persuasive and pragmatic significance. They show that police administrators and advisors are themselves aware of the potentials for abuse if a juvenile is un-aided by counsel, parent, or adult friend when interro-

---

[16] Pennsylvania State Police Community Relations Manual, Chapter VII-6 (1969), at 24. The FBI National Academy's manual on police interrogation suggests that during the administration of the *Miranda* warnings "counsel be considered an absolute necessity for those 15 years and younger" and "highly desirable" for an older individual still classified as a juvenile. FBI National Academy, Police Interrogation, The Miranda Rule at 128, 129 (1968).

gated by the police. The manuals convincingly refute any apprehensions that the required presence of adults would in any way impinge upon or frustrate responsible existing police practices. The result reached by the majority contradicts present police procedures in questioning juveniles.

In attributing to Leonard Moses the capacity to waive his rights in the absence of adult guidance, the majority ignores the previous judgments of this Court and the long established policy in this Commonwealth of precluding minors from making legally binding decisions. For example, minors in the absence of consent by parents or guardians. are not permitted: to consent to medical treatment unless medical necessity dictates, Act of February 13, 1970, P. L. 19, §§1-5, 35 P.S. §§10101-105; to give blood, Act of December 9, 1969, P. L. 333, §1, 35 P.S. §10001; to obtain a marriage license, Act of August 22, 1953, P. L. 1344, §5, as amended, 48 P.S. §§1-5(c); to compromise, settle, or discontinue pending actions, Pennsylvania Rules of Civil Procedure 2039(a). Furthermore, it has long been the law of Pennsylvania that minors are not bound by contracts they enter except for necessities. *Schmucker v. Naugle,* 426 Pa. 203, 205, 231 A. 2d 121, 123 (1967); *Pankas v. Bell,* 413 Pa. 494, 498, 198 A. 2d 312, 314 (1964); *O'Leary Estate,* 352 Pa. 254, 42 A. 2d 624 (1945). Under the majority's ruling a minor is given more legal protections in making decisions involving his rights in civil law matters than the majority accords this minor in waiving constitutional rights involving his life and liberty.

Reviewing the record and applying, as we must, the constitutional mandates of *Haley, Gallegos, Miranda* and *Gault,* and the controlling principles of our decisions in *Darden* and *Harmon,* it must be concluded that the warnings administered to this sixteen-year-old de-

374

fendant were inadequate and that his "waiver", under these circumstances, failed to meet the constitutional standards of *Johnson v. Zerbst* and the decisions of this Court, supra. Leonard Moses was in a difficult position "which can overawe and overwhelm a lad in his early teens." During the "critical hours of questioning" he was without "counsel or friend". *Haley v. Ohio,* 332 U.S. at 600, 68 S. Ct. at 304. No one stood guard "to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion". Id. Responsible police and other authorities throughout the Commonwealth concerned with juveniles for many years have realized that a youth in such a "predicament" should have a parent, adult friend, or counsel to insure ". . . a full appreciation of . . . [his] freedom of choice". Id. at 601, 68 S. Ct. at 304. Here, as in *Haley* and *Gallegos,* no such advice concerning the fundamental constitutional protections was made available to this sixteen-year-old youth. He was not equipped to make this critical decision alone and his waiver was legally insufficient when measured by the standards enumerated above.

I would reverse the judgment of sentence and grant a new trial.

Mr. Justice O'BRIEN joins in this dissenting opinion.