## Commonwealth v. Chase (No. 1)

*Robert C. Lear, District Attorney*, for Commonwealth.

*Ronald E. Vican, Charles P. Eyer, George Royle, IV, & George Westervelt*, for defendants.

WILLIAMS, *P. J.*, March 31, 1975—Defendants seek to suppress inculpatory statements given to

Pennsylvania State Police, Robert Werts and Kenneth Meinhart, in the Monroe County jail on January 27, 1975. From the evidence adduced at suppression hearing, the court makes the following findings of fact

## FINDINGS OF FACT

1. On the evening of January 24, 1975, Robert Zane was shot and killed at a gas station operated by him, situated in Monroe County, Pa. The shooting was the outgrowth of a robbery.

2. On January 27, 1975, the State Police had a description of the type of vehicle used in the commission of the crime, were aware of its color and, through investigation, were aware that one of defendants, Gregg Porter, was the owner of a vehicle which matched the description in its possession.

3. The police were also informed by Robert Gunnels that he had a telephone conversation with Gregory Powlette, one of defendants, at about 6:30 p.m. on January 24, 1975, in which Gregory Powlette advised the witness that he, Gregg Porter and Michael Chase planned to rob Zane's Service Station.

4. The police were further aware, through Robert Gunnels, that Robert Gunnels had met Powlette, Porter and Chase at a party at the home of one Cynthia May at about 11 p.m. on January 24, 1975. All three defendants arrived at the party at the same time. Gunnels told the police that he asked Powlette if he done it and Powlette replied, "Bobby, I don't believe it, I shot him." Gunnels also talked to Porter. He testified:

"Then I turned to Gregg Porter and I asked him if it was true and he said, 'I don't believe it Bob, it's not cool.' I asked him how much money it was done

for, he indicated to me with his hand, he held up two fingers and then four, and I said was it $240.00? He nodded yes." Gunnels also talked to Chase, who refused to talk with him.

5. On January 27, 1975, prior to the issuance of arrest warrants by district justice of the peace, Eleanor Randolph, Gunnels appeared at her office, was placed under oath and gave to her the same information which he gave to the State Police.

6. Arrest warrants were issued at about 1:50 p.m. on January 27, 1975, and served by the State Police on the three defendants at the East Stroudsburg Area School District parking lot, shortly after 2 p.m. on the same day.

7. All three defendants were given a preliminary arraignment before Eleanor Randolph, district justice of the peace, between 2:08 p.m. and 2:18 p.m. on January 27, 1975.

8. At the time of arrest, all three defendants were informed of their Miranda rights, they were again informed of the Miranda rights by the district justice of the peace at their preliminary arraignments.

9. At the time of preliminary arraignments, each defendant was given a copy of the complaint and application for the appointment of public defenders to represent them.

10. The district magistrate advised defendants that she was without authority to grant bail on the charges, which included criminal homicide, and committed them to the Monroe County jail.

11. Defendants, Chase and Porter, were transported from the place of arrest to the office of the district justice of the peace by Corporal Orehek and Trooper Meinhart. No questions were asked of the defendants in the course of the trip to the district justice's office.

12. After the commitment to the county jail was issued by district justice of the peace Randolph, the same police officers transported Chase and Porter to the Monroe County jail. During this trip, Corporal Orehek asked if it was the general policy for them to be drinking in the parking lot instead of being in school, to which Porter replied, "I know my rights, I don't have to say anything." Chase remained silent.

13. Trooper Werts transported Gregory Powlette to county jail, arriving at about 3 p.m., shortly before Chase and Porter arrived at the jail.

14. Trooper Werts told the jail guard, in the presence of defendants, that he could afford defendants the right to use the telephone. The guard, Larry Sebring, did advise each of the three defendants they could make one telephone call, but neither Porter or Chase made a call.

15. Trooper Werts interviewed defendant Chase at the Monroe County jail at 4:20 p.m. He first gave him his Miranda rights and obtained from Chase a signed waiver of his rights. At the time the rights were given, Trooper Werts told Chase to read these rights, which he did. He asked him if he had any questions about them and Chase replied, "No." He asked him if he understood them and Chase replied, "Yes." Chase then told Trooper Werts that the three defendants had gone to a bowling alley in East Stroudsburg; that Powlette left for a period of about 15 or 20 minutes and then returned; that all three then went to Hainesburg, N.J., and had a few drinks. They then went to a party at Mike Costanzo's home. Later, they went to another party at the home of Cynthia May on Route 402; after this party, they went home.

16. Trooper Werts advised Chase that the state-

ment was not the same as Powlette's; that Powlette had told him all three remained at the bowling alley, whereupon Chase said, "this is the way it is." Chase talked so rapidly, the trooper could not write down what he was saying. The trooper then gave Chase paper and pencil and told him to write out his version of what happened. Chase then wrote an inculpatory statement and signed it.

17. During this interview, Trooper Meinhart, who was present, advised Chase that if he wanted anyone there or if he wanted to stop he could stop.

18. After giving the written statement, Trooper Werts asked Chase if he wanted to use the telephone and Chase declined to use it.

19. When the statement was given, there was nothing unusual about the physical condition of Chase. He had no speech problems, his voice was not slurred.

20. Trooper Werts, with Trooper Meinhart present, first interviewed defendant Porter at 3:45 p.m., at which time the Miranda rights were read, but no written waiver was executed by Porter. Porter advised Trooper Werts that he understood his rights. At this interview, Porter gave Trooper Werts an oral statement substantially the same as the one given by Chase. After this oral statement, Porter was turned over to the guard for the evening meal.

21. A second interview with Porter began at about 6 p.m. Trooper Werts handed Porter a rights form and asked him to read it. Porter advised Trooper Werts that he had no questions about it and that he understood it and signed the waiver of his rights at 6:05 p.m. Porter then began giving the trooper the same statement he had given at the first interview. The trooper told him that his statement was inconsistent with a statement that Chase had already given him. Porter asked to see Chase's

statement, which was handed to him. Porter examined the statement and the signature attached thereto. Werts then gave Porter a pencil and paper and told him he should write any statement he wished to make. Porter then wrote out an inculpatory statement and signed it. After the statement was given, Porter declined to use the telephone.

22. At the time the statement was given, there was nothing unusual about the physical condition of Porter, his speech was not slurred.

23. At the time Porter was being transported from the point of arrest to the district justice of the peace office, Corporal Orehek did observe the odor of alcohol on Porter's breath.

24. The State Police did not notify the parents of Porter of the fact of his arrest until about 8:45 p.m. on January 27, 1975.

25. A short time after the call to the Porter parents, which was made by Trooper Kresge, Kresge answered a telephone call from the father of defendant Chase. Trooper Kresge told Mr. Chase that he was about to telephone him; that he had just talked to the Porter family. Mr. Chase asked Trooper Kresge why he had not informed him of the arrest of his son and the trooper advised him that it was not necessary.

26. At the time of their arrest, all three defendants were 17 years of age and were members of the senior class of the East Stroudsburg Area School District.

27. The inculpatory statements given by Michael Chase to Trooper Werts were voluntarily and knowingly and understandingly made.

28. The inculpatory statement given by Gregg Porter to Trooper Werts was knowingly and understandingly made.

29. At the time the inculpatory statements were

made, both Gregg Porter and Michael Chase understood they had the right to remain silent and the right to free counsel.

30. There was no coercion employed by the police to obtain the inculpatory statements of either Gregg Porter or Michael J. Chase.

31. At the time the inculpatory statements were given, neither Gregg Porter or Michael J. Chase suffered from any physical or mental impairment.

## THE DEFENDANT CHASE'S PETITION

This petition raises three legal issues: (1) was Chase's arrest illegal because the arrest warrant was issued without probable cause? (2) was the statement involuntary because (a) defendant was 17 years of age (he is now 18) when the inculpatory statement was given without the counsel and advice of a parent or concerned adult; (b) because his parents were not notified of his arrest; (c) that he had indicated to State Police on the trip from the point of arrest to the preliminary arraignment that he wished to remain silent; (d) under the facts and circumstances it was not given knowingly.

*Was the arrest illegal?*

Counsel for Chase present the novel argument that the affidavit on which the arrest warrant was issued is conclusory; that is fails to set forth sufficient information on which the issuing district justice of the peace could find probable cause to issue the warrant. Counsel seeks to have the court apply the law relating to search warrants to arrest complaints. We find nothing in the law to sustain this position.

There appeared before the district justice Robert Gunnels, who was sworn and told the district justice that about 6:30 p.m. on January 24, 1975, in a

telephone conversation, Gregory Powlette, a codefendant of Chase, that he, Chase and Gregg Porter planned to rob the Zane Service Station that evening to obtain money. Later that evening, at about 11 p.m., he saw the three defendants arrive at a party at the home of Cynthia May. He asked Powlette if he had done it and he told him he had shot Zane. He talked to Porter who told him they obtained $240 in the robbery. Chase would not talk.

This information was sufficient to permit the district justice to find that Powlette, Chase and Porter had entered into a conspiracy to rob the Zane Service Station, and in the attempt to carry out the robbery, Powlette shot Zane and $240 was taken. While there was no admission on the part of Chase, since a conspiracy was established, the statement of one of the conspirators became the admission of all the conspirators. See Commonwealth v. Hirsch, 226 Pa. Superior Ct. 494 (1973), Dutton v. Evans, 400 U.S. 74 (1970).

There was ample information furnished the district justice on which to make an independent judgment of probable cause.

Counsel argues that it was improper for the district justice to consider the sworn oral statement of Gunnels. She could only consider the contents of the complaint affidavit. We do not agree. She had the opportunity to judge the credibility of the witness Gunnels and determine his credibility as a witness. To require that the district justice have information of the reliability of a witness as contended by counsel would be to place a greater burden upon a district justice to find probable cause to issue an arrest warrant than the law places upon a jury to convict. At trial, credibility of Gunnels will be determined by the trial jury. It would be un-

reasonable to hold that a jury could convict an accused based upon the testimony of Gunnels, but a district justice may not issue an arrest warrant on the same testimony.

Prior to the adoption of Pa.R.Crim.P. 2003 on March 28, 1973, a court in determining whether probable cause existed for the issuance of a search warrant, could consider sworn oral statements not contained in the affidavit: Commonwealth v. Milliken, 450 Pa. 310 (1973).

Since the Supreme Court has not promulgated a similar rule as to arrest warrants as it has in the case of search warrants, we think the ruling in Milliken may still be properly applied to arrest warrants.

We find the complaint satisfies all the requirements of Pa.R.Crim.P. 132.

Should the inculpatory statement be excluded because it was made without counsel and without the advice of a parent or concerned adult?

This issue is discussed and decided against the position of defendant in Commonwealth v. Moses, 446 Pa. 350 (1971), where the court said at page 354:

"It is not asserted that Moses was not fully and clearly advised of all of his constitutional rights before he incriminated himself. But, it is argued that a 'juvenile lacks the ability' to fully understand and assert his constitutional rights and, hence cannot effectively waive such rights without the advice of a more mature person. We emphatically reject such a prophylactic rule, particularly where a sixteen-year or seventeen-year-old is concerned."

The court went on to say:

"It is true that, in determining whether in-

criminating statements of an accused were voluntarily given and whether or not he intelligently waived his constitutional rights, all of the attending circumstances must be considered, including the age, maturity and intelligence of the individual involved. See Commonwealth v. Darden, 441 Pa. 41, 271 A. 2d 257 (1970), and Commonwealth v. Taper, 434 Pa. 71, 253 A. 2d 90 (1969). Cf. also, United States ex rel. Loray v. Yeager, 446 F. 2d 1360 (3d Cir. 1971). And where the accused is of tender years, the attending circumstances must be scrutinized with special care. *However, to declare as a matter of law that a sixteen-year-old, regardless of maturity and intelligence, is unable to fully understand when he is informed of his constitutional rights and may not by himself waive his right to counsel before being questioned by the police would be to ignore reality and the sophistication of the average sixteen-year-old in these days and times."* (Emphasis supplied).

*If a defendant indicates he wishes to remain silent may he subsequently be interrogated?*

The testimony does not disclose that Chase ever orally stated that he wished to remain silent.

All that is disclosed is that when he and Porter were being transferred to the preliminary arraignment, a question not relating to the charges lodged against them was asked by a State Policeman. Chase said nothing. Never does it appear that he told Trooper Werts, who interviewed him at the jail, he wished to remain silent. Construing his silence in the police car as a nonverbal declaration of the exercise of his right to remain silent, we do not believe that, as a matter of law, that would prohibit a police officer from subsequently interviewing him. He had the right to change his mind. In

Commonwealth v. Bullock, —————— Pa. ——————, 328 A. 2d 493 (1974), defendant asked permission to contact an attorney before he talked to police. He dialed an attorney but there was no answer. He was asked if he wanted to wait and try again "or do you want to tell us what took place?" He said, he would tell them. A majority of the court held that defendant "had the right to change his mind and speak to the police without the presence of counsel."

Here, the interrogation began at about 4:20 p.m., about two hours after defendant was preliminarily arraigned and about 2 hours and 20 minutes after he was arrested.

Defendant had been given the Miranda rights three times, knew the charges against him and knew that he had the right to remain silent. He likewise knew he was entitled to free counsel.

Under these circumstances, we hold that the inculpatory admission is not per se involuntary because he had previously by his silence, indicated he wished to remain silent.

*Was the statement involuntary because the defendant's parents were not promptly notified of his arrest?*

Defendant contends that since he was 17 and thus a juvenile at the time of his arrest, his inculpatory admission was unlawfully obtained because the police violated section 13 of the Juvenile Act of December 6, 1972 P.L. 1464, (No. 333), 50-310 11 PS §50-309, which provides:

"(a) A person taking a child into custody, with all reasonable speed and without first taking the child elsewhere, shall

"(1) Notify the parent, guardian or other custodian of the child's apprehension and his whereabouts. . . ."

Section 7 of the Juvenile Act, 11 PS §50-303, also provides:

"If it appears to the court in a criminal proceeding *other than murder*, that the defendant is a child, this act shall immediately become applicable. . . ." (Emphasis supplied).

It appears that the legislative intent is that the crime of murder is exluded from the operation of the juvenile act. Here, the charge against defendant, if sustained, would constitute a felony murder or murder of the second degree. Under the law, the most the court may do where a child is charged with murder, is to sit as a committing magistrate and determine if the Commonwealth has established a prima facie case of murder. If so, the court *must* certify the case to the criminal courts. This is the case law and is legislatively mandated by the juvenile act. See 11 PS §50-325(e) which reads:

"(e) Where the petition alleges conduct which if proven would constitute murder, the court shall require the offense to be prosecuted under the criminal law *and procedures* except where the case has been transferred from the criminal court pursuant to section 7 of this act." (Emphasis supplied).

The court has already refused to transfer the case to juvenile court on petition of defendant. Defendant had waived preliminary hearing before the district justice and his counsel advised the court that he did not wish a preliminary hearing before a juvenile judge.

Under these circumstances, we find that *criminal procedures* and not *juvenile procedures* apply and the requirements of section 13, 11 PS §50-310, are not applicable.

We point out that defendant was given the oppor-

tunity to telephone his parents. He was present when Trooper Werts advised the jail guard that each of defendants was allowed a telephone call. The jail guard advised defendant he could make one call. He made no call. Also, after he had his inculpatory admission, he declined the opportunity to make a telephone call. The juvenile, who is literate, a high school senior and not a child of tender years, had the opportunity to call his parents before he made any statement.

We rule, (1) that criminal and not juvenile procedures apply; (2) that the juvenile had opportunity to call his parents and failed to avail himself of the opportunity; (3) that the evidence fails to show that the juvenile was prejudiced by an alleged illegal arrest in that the statement was not the product of an exploitation of an illegal arrest: Commonwealth v. Holton, 432 Pa. 11 (1968).

*Under the totality of the circumstances was the inculpatory statement involuntary?*

In answering this question, we must consider all the attending circumstances including the age, maturity and intelligence of defendant: Commonwealth v. Moses, 446 Pa. 350 (1971). Here, as in Moses, it is not asserted that defendant was not fully and clearly advised of all his constitutional rights before he incriminated himself. Likewise, as in Moses, defendant argues because of his age he lacked maturity and understanding to voluntarily incriminate himself. The record is totally void of any evidence that the police were abusive or coercive. He knew the specific charges against him. The testimony is that there was nothing about him which showed any physical impairment. The period of interrogation was relatively brief. It began at 4:20 p.m. The statement was concluded at 5:30

p.m. Defendant did not testify and, as a result, the court did not have the opportunity to personally observe him as a witness. His general appearance is that of a neat, intelligent, alert young man.

He is literate; a high school senior. Obviously, he possesses the intelligence to make passing academic grades. That he is informed of his rights is demonstrated by his silence while being transferred to his preliminary arraignment. That he is intelligent and capable of self-protection is shown by his refusal to talk to Gunnels at the party at the May residence on January 24, 1975.

He personally wrote the inculpatory statement. The words are his own and not a paraphrase of what he said.

His age is a factor but he is not a child of tender years. He is now 18, having been born on March 14, 1957.

Under the totality of the circumstances, we find the Commonwealth has met its burden of proof, that the oral and written inculpatory statements of Michael Chase were voluntarily and knowingly made.

## THE PORTER PETITION

This petition raises these legal issues:

1. Is it necessary for a defendant to be represented by counsel at his preliminary arraignment?

2. Is the waiver of constitutional rights by a juvenile per se involuntary unless the juvenile's parent, guardian or custodian have been notified of his arrest and whereabouts?

3. When defendant had declared his intention to remain silent, were the police thereafter precluded from seeking to interrogate him?

4. Were the admissions secured by impermissible psychological coercion and trick?

5. The arrest was illegal and the confession was tainted by that illegal arrest.

*Was it necessary for defendant to have counsel at his preliminary arraignment?*

It is elementary that a defendant has the right to counsel at every critical stage of the proceeding.

Is a preliminary arraignment a critical stage of the proceeding? Pa.R.Crim.P. 318(b) provides:

"In all court cases counsel shall be assigned prior to the preliminary hearing to all defendants who are without financial resources or who are otherwise unable to employ counsel."

The plain import of this rule is that the constitutional rights of an accused are protected when he is represented by counsel prior to the preliminary hearing. Defendant was so represented.

At a preliminary arraignment, the accused enters no plea. No evidence is taken. He is informed by the district justice of the peace of the exact nature of the charges against him and his constitutional rights. This is not a critical stage of the proceedings and under Pa.R.Crim.P. 318(b) appointment of counsel at that time is not mandated.

*Is an inculpatory statement by a juvenile involuntary unless the juvenile's parent, guardian or other custodian is notified of his arrest and his whereabouts?*

This is the same issue raised by co-defendant Chase. We hold it is not and refer to our discussion on this issue in respect to the Chase petition for our reasons for so ruling.

*When a defendant declares his intention to re*

*main silent, does this preclude a later attempt to interrogate him?*

Again we hold that the police were not so precluded on the basis that the juvenile had a right to change his mind. See Commonwealth v. Bullock, supra.

The factual situation here differs only from the Chase situation in that here, Porter verbally stated, while being transferred to his preliminary arraignment, that he did not have to say anything. This distinction, however, does not alter the fact that he could change his mind and he did. If he wished to preclude interrogation, he was well aware that he could do so by remaining silent.

*Were the admissions secured by psychological coercion and trick?*

The only testimony to support this argument is that Trooper Werts told Porter that he had an inculpatory statement from Chase. Porter asked to see it and it was shown to him.

So long as the trooper was truthful, as he was, the statement that he had such inculpatory admission was not improper nor did it constitute trickery or psychological coercion. When confronted with the statement, which inculpated him, defendant did not stand mute, as he knew he could, but gave the inculpatory written statement. Under such circumstances, the statement is not inadmissible at trial: Commonwealth v. Jefferson, 430 Pa. 532 (1968).

*Was the arrest illegal and the confession tainted by that illegal arrest?*

We find the arrest legal for the reasons stated in our discussion of this issue raised by the Chase petition. Moreover it is our understanding that

defendant did not press this reason at the suppression hearing or counsel's oral argument.

*Under the totality of the circumstances was the confession of Gregg Porter voluntary?*

As stated in considering this same issue in respect to the statement given by Michael J. Chase, we must consider all the attending circumstances including the age, maturity and intelligence of defendant. At 17, defendant is not a child of tender years. He is literate, a high school senior and apparently sufficiently intelligent to do satisfactory study at the high school level. There is no doubt that he was given his Miranda rights. That he understood these rights is shown by his statement shortly after his arrest to the effect that he knew his rights and did not have to say anything. This statement also demonstrated his will was sufficiently strong to assert his right to remain silent. The interviews were brief. The first lasted about 20 to 25 minutes. The next about one and one-half hours.

It was when Porter was shown Chase's inculpatory statement that he broke his silence. The fact that he knew Chase's statement inculpated him appears to be the principal factor which led him to give the written inculpatory statement. There was nothing coercive or improper in Trooper Werts showing him the statement. In fact, Porter asked to see it when Trooper Werts informed him of its existence. As long as the trooper told Porter the truth about a confederate's inculpatory statement, he acted properly, and a statement secured after acquainting an accused that a confederate has made an inculpatory statement, unless otherwise tainted, meets the test of voluntariness.

We find that the Commonwealth has met its burden of proof and that the inculpatory statement was voluntarily given.

## CONCLUSIONS OF LAW

1. The oral and written inculpatory statements of Michael J. Chase were voluntarily and knowingly and understandingly given.

2. The written inculpatory statement of Gregg Porter was voluntarily and understandingly given.

3. That the arrests of Michael J. Chase and Gregg Porter were valid arrests.

4. That there is no statutory or rule of criminal procedure which requires the police to notify parents, guardians or custodians of juveniles arrested on a murder charge.

5. There is no constitutional requirement that a juvenile charged with murder be represented by counsel at his preliminary arraignment.

6. The police are not precluded as a matter of law, from later interviewing an accused who had previously declared his desire to remain silent as long as coercive tactics are not employed to procure the interview.

7. The inculpatory oral and written statements made by Michael J. Chase shall be admissible at trial.

8. The written inculpatory statement of Gregg Porter shall be admissible at trial.

## ORDER

And now, March 31, 1975, petition of Gregg Porter to suppress an inculpatory statement made January 27, 1975, is denied. The petition of Michael J. Chase to suppress an oral and written inculpatory statement made January 27, 1975, is denied. It is ordered that said inculpatory statements shall be admissible at trial. It is further ordered that the prothonotary shall impound these proceedings as required by Pa.R.Crim.P. 323(g).