Commonwealth *v.* Darden, Appellant.

Argued May 27, 1970.   Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Richard C. Angino,* for appellant.

*Jerome T. Foerster,* Assistant District Attorney, with him *LeRoy S. Zimmerman,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, November 12, 1970:

About 9:30 p.m. on Friday, February 9, 1968, following a high school basketball game in the city of Harrisburg, several fights broke out on the parking lot adjoining the gymnasium between groups of black and white boys.   In one of these altercations, Frank J. Ament, Jr., a white boy fifteen years of age, suffered contusions of the face and head and a stab wound in the back from a "sharp pointed instrument."   The last mentioned wound perforated one of the main arteries

in the body, the subclavian artery, resulting in massive hemorrhaging in the right pleural cavity and caused almost instant death. Ben David Darden, Jr., born on June 18, 1952, was arrested and charged with Ament's murder. After indictment, he was tried before a jury and convicted of murder in the second degree. This appeal is from the judgment of sentence imposed in the lower court.

At trial, an incriminating oral admission and a stenographically recorded statement made by Darden to the police were admitted in evidence over objection. This is assigned as error on the ground that at the time this evidence was obtained, Darden, allegedly did not "voluntarily, knowingly and intelligently" waive his constitutional rights, and hence its use violated due process.

A pretrial motion to suppress evidence of the recorded statement was timely filed.[1] An evidentiary hearing was conducted in accordance with the mandate of *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774 (1964), and the Pennsylvania Rules of Criminal Procedure, after which the motion was denied.

As to the background of Darden's arrest and the attending circumstances of his incriminating admission and statement, the Commonwealth's evidence at the suppression hearing was as follows:

Darden and several friends attended the basketball game involved and left the gymnasium during half-time. About 8:50 p.m., when they sought to return, readmittance was refused at the main entrance, resulting in an altercation between the group and the ticket takers. However, entrance was then gained by the group at another gate. The police were alerted to the above trouble,

---

[1] The defense apparently was not aware pretrial of the evidence of the oral admission, and the question of its admissibility did not arise until the trial.

and when the fighting started on the parking lot after the conclusion of the game, several officers were on the scene very quickly. Three black youths were observed running away, and Ament was found on the ground fatally wounded.

From information received, the police were led to believe that Ament's injuries were due to having been assaulted on the head by a wine bottle wielded by a youth named Douglas Sims. However, the police learned that Darden was also a participant in this particular fight, and officers were dispatched to look for him. One of these officers visited Darden's residence, but he was not at home. The officer talked with Darden's mother and requested that she phone the police when he returned.

About 11:10 p.m., Darden was picked up by the police on the street near the Y.M.C.A. and was taken to police headquarters. About 11:45 p.m., on February 9th, he was questioned by a lieutenant of the City Police Department assigned to and in charge of the Youth Special Service Division. Three other police officers, one of whom was a black man, and an assistant district attorney were present at the time. Darden was without counsel. This questioning continued until 1 a.m.

Before the questioning commenced, the lieutenant informed Darden that he was seeking information about the fight on the gymnasium parking lot and the identity of the youth who struck Ament with the wine bottle. The lieutenant then read to Darden from a printed card a warning of all of his constitutional rights required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). After the warning of each specific right was read, Darden was asked, "Do you understand that?" Then there was a pause until Darden answered. In every instance his reply was, "Yes." After the reading of the warning of all rights was completed, Darden was

again asked if he understood his rights, and again he replied in the affirmative and said that he was willing to answer questions. The questioning that followed dealt with the trouble outside the gymnasium following the game, as well as that at the main entrance with the ticket takers during the game. As the questioning progressed, one of the ticket takers appeared in the room briefly and identified Darden as one of those involved in the fracas at the entrance to the gymnasium following half-time. Since the questioning officer was still under the belief that Ament's injuries resulted solely from being struck with a wine bottle, the questioning did not deal with a stabbing or knives. In fact such were not mentioned. Darden denied that he hit Ament with a bottle and denied knowledge of the identity of the person who did.

About 2 a.m. on February 10th, Darden was lodged temporarily in a cell which contained a bed, a toilet and a water drinking fountain. In the meantime, Douglas Sims and other youths had been taken into custody and were being questioned about the trouble at the gymnasium in various rooms at police headquarters.

About 3 a.m. Darden was questioned by two other police detectives. Before this questioning began, Darden was again read a warning of his rights as dictated by *Miranda,* supra, and again he said that he understood and was willing to answer questions. After this questioning proceeded for some minutes, the detectives involved were informed for the first time that an examination of Ament's clothing indicated that he had been stabbed, and the questioning then focused on this aspect. Darden then admitted being in the fight with Ament and using a knife. He said that one of his friends was fighting with Ament and hit him over the head with a bottle. Darden then started "swinging it [the knife] wildly" and "didn't intend to cut him

[Ament]" but "somehow cut the boy," and then he noticed blood on the knife. He also informed the police of the identity of the boy to whom he had given the knife after the fight. A female employee of the district attorney's office stenographically recorded Darden's statement, and after it was typewritten it was given to Darden to read. About 3:45 a.m. he signed his signature on each page thereof.

Shortly thereafter, Darden was transferred to the Juvenile Detention Center in a police car. During the trip, in the course of a conversation with the operator of the vehicle, he said he had been in a fight at the gymnasium and stabbed a boy.

A warrant charging Darden with Ament's murder was issued on February 15, 1968, and the same day he was arraigned before a magistrate. The preliminary hearing, with Darden represented by the public defender's office, followed on February 23rd. On March 4th, trial counsel was appointed by the court.

At the suppression hearing, Darden personally testified to consuming a substantial quantity of whiskey before and during the basketball game. He also described in detail the circumstances of his questioning by the police officers. His description thereof did not vary significantly from that of the Commonwealth witnesses, except he did say that the second period of questioning during which the written statement was obtained consumed "maybe two hours." Significantly, Darden did not deny that he was given the warning of his *"Miranda"* rights before the questioning began and, more significantly, he did not say or indicate that he did not understand this warning. He admitted that he was given the challenged typewritten statement to read before he signed it, and said that while he didn't "read everything", it did not contain any words that he didn't

understand and he didn't ask anyone to explain any of the words.[2]

The testimony of Dr. Leonard M. Cohen, a clinical psychologist, who had given various psychological tests to Darden at his counsel's request, was then introduced. Dr. Cohen said that in these tests Darden came out with a verbal I.Q. of 71, a performance I.Q. of 75 and a full scale I.Q. of 76, "classifying him at a border line or a mildly retarded level." He also stated that in terms of the chronological test age, Darden would range "from a youngster chronologically aged 8 to 11½ [years] . . . ."

Darden's mother testified to his poor record and progress in school. She also stated that, while she received a phone call from the police about 5 a.m. on February 10th, informing her that her son was being held at the Juvenile Detention Center, she was not permitted to see him until Wednesday, February 13th. However, it was manifested by her own testimony that the delay in seeing her son was due to her misunderstanding of visiting days at the center, rather than any effort on the part of the police to hold Darden incommunicado.

The Commonwealth then introduced the testimony of a psychiatrist who expressed the opinion that during the period of police questioning on February 9th and

---

[2] The beginning of the statement contained a transcription of the "*Miranda*" warnings as given to Darden before the statement was made. Each warning was couched in the form of a question. For example, "Ben, you understand you have a constitutional right to remain silent?" Answer, "Yes, sir." "If you want a lawyer to be present now or at any time during these questions you have a right to have one to consult with before or during this questioning, do you understand this?" Answer, "Yes." "If you can't afford a lawyer the court will appoint one for you and I will no longer be able to talk with you until you have time to consult with one, do you understand this, do you understand this?"

10th, Darden was mentally capable of knowing what he was doing and was able to understand the consequences of his statements.

Darden's position, briefly stated, is that evidence of his oral admission and written statement should have been suppressed and excluded at trial, because at the relevant time he did not understand his constitutional rights, and hence could not effectively waive them. This conclusion, it is argued, is compelled as a matter of law because of Darden's age, his low mental ability plus the adverse environment under which he was questioned in the absence of friend or counsel. We cannot agree.

It is unquestionably correct that unless Darden was aware of all of his constitutional rights before the police questioning began, which induced the challenged incriminating evidence, evidentiary use thereof was constitutionally proscribed. *Miranda v. Arizona,* supra. And in determining if Darden was aware of his rights, he cannot be judged by the more exacting standards of maturity. However, after a very careful study of all of the circumstances disclosed by the record, including Darden's own testimony, both at the suppression hearing and at trial,[3] we conclude that the court below committed neither an abuse of discretion nor an error of law in finding that the required knowledge and understanding existed and in ruling that what weight, if any, should be given to the evidence involved was for the jury. Cf. *Commonwealth ex rel. Joyner v. Brierley,* 429 Pa. 156, 239 A. 2d 434 (1968).[4]

---

[3] A reading of Darden's own testimony leaves little doubt but that he had the ability to understand even under adverse circumstances. The trial court, after observing him and hearing his testimony, described him as "remarkably alert, aware and responsive."

[4] See also, *Boulden v. Holman,* 394 U.S. 478, 89 S. Ct. 1138 (1969), and *Commonwealth ex rel. Brown v. Myers,* 433 Pa. 25, 249 A. 2d 337 (1969).

In our view, *Haley v. Ohio*, 332 U.S. 596, 68 S. Ct. 302 (1948), and *Gallegos v. Colorado*, 370 U.S. 49, 82 S. Ct. 1209 (1962), do not control. Admittedly, there is language in these decisions which lends comfort to Darden's position, but this language must be considered in context and in the light of the facts presented in these cases.

*Haley* and *Gallegos*, supra, were both decided prior to *Miranda*, supra, and, while not required, in neither case was the accused informed of his constitutional rights. Nor was there an iota of evidence that either one was aware of these rights. This is an important distinguishing feature in the present case. Moreover, in *Haley* the fifteen-year-old accused was interrogated constantly by the police officers for five solid hours before the excluded confession was obtained, and at one point during this period, when one group of questioners grew tired, they were replaced by a fresh team. Additionally, there was evidence that Haley had been beaten and mistreated by the police when he was first taken into custody, a fact nowhere suggested herein.

In *Gallegos*, supra, the challenged confession was not obtained until after the accused had been held in security detention for five days, during which time he saw no one but members of the police. Also, during this time, Gallegos' mother made repeated efforts to see him, but her requests were denied. It is patently clear that *Haley* and *Gallegos* are not this case.

During his trial testimony, the police lieutenant who first questioned Darden in police headquarters on the night of February 9, 1968, was asked by the district attorney if he noticed anything unusual about Darden's physical appearance or condition at the time. He responded, "No, nothing unusual." He was then asked if he had occasion to know Darden previously, and replied, "I have known Ben through my work for

approximately two years prior to this. He has been in my office . . . approximately 6 to 8 different occasions." Another police officer, who had also been in the presence of Darden when he was taken into custody on February 9th, was asked about Darden's appearance and apparent physical condition at the pertinent time. Further inquiry then brought the response that in his work this officer had learned of Darden being on the street after the hour of 12:30 a.m. at least four times prior to the occasion involved, and the officer had talked with him about it.

It is maintained that this type of inquiry was a deliberate attempt to create in the minds of the jurors the impression that Darden was a "bad boy" with a prior criminal record, was unduly prejudicial and at least a technical violation of Section 19 of The Juvenile Court Act, Act of June 2, 1933, P. L. 1433, 11 P.S. §261.[5]

No extended discussion is needed to show that the inquiries and testimony now asserted as error did not violate the Act of 1933, supra. Nor are we persuaded that the present situation may be equated with that presented in *Commonwealth v. Jenkins*, 413 Pa. 606, 198 A. 2d 497 (1964), wherein we condemned questioning which was primarily for the purpose of calling the jury's attention to prior misconduct of the accused. Herein, in view of Darden's testimony, both at the suppression hearing and at trial, as to his drinking intoxicants before the stabbing and before the making of the

---

[5] Section 19 of the Act of 1933, supra, provides: "No order made by any juvenile court shall operate to impose any of the civil disabilities ordinarily imposed by the criminal laws of the Commonwealth, nor shall any child be deemed to be a criminal by reason of any such order or be deemed to have been convicted of crime. The disposition of a child or any evidence given in a juvenile court shall not be admissible as evidence against the child in any case or proceeding in any other court."

incriminating statement, Darden's physical and mental condition at the times involved became an important fact. *Spano v. New York,* 360 U.S. 315, 79 S. Ct. 1202 (1959). The challenged testimony was relevant to establish the ability of the officers to evaluate Darden's condition on the night of February 9th and to lend weight to their testimony that at that time there was nothing unusual apparent in his condition. Cf. *Commonwealth v. Myers,* 439 Pa. 381, 266 A. 2d 756 (1970).

The only remaining assignment of error requiring discussion concerns the exercise of peremptory challenges as to prospective jurors by the Commonwealth. It is urged that there was a systematic effort by the district attorney to exclude jurors because of their race. We are unconvinced. The record shows that the Commonwealth exercised seven of a permissible twenty peremptory challenges. Four of these challenges were utilized to excuse black people and no one of this race was seated as a member of the ultimate trial jury.[6]

It is a violation of due process to exclude jurors by reason of their race. *Whitus v. Georgia,* 385 U.S. 545, 87 S. Ct. 643 (1967), and *Pierre v. Louisiana,* 306 U.S. 354, 59 S. Ct. 536 (1939). The burden of proving the existence of a purposeful discrimination is on the party who asserts it; however, if a prima facie case is established, then the burden shifts to the prosecution. *Whitus v. Georgia,* supra. We are not persuaded a prima facie case of racial discrimination was established.

Judgment affirmed.

---

[6] Darden does not complain of any racial imbalance in the panel of jurors, and the record does not disclose the racial proportions included therein. Nor does the record disclose if any black people were called and excused for cause. It is also to be noted that when the Commonwealth exercised a peremptory challenge, no objection was then entered. It was only after the entire jury had been accepted following extended voir dire that it was asserted racial discrimination had been practiced.

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

## I.

I do not believe that this boy could, without first seeing and being given advice by some adult friend or counsel, voluntarily agree to waive his constitutional rights in response to the *Miranda* warnings.

"No single litmus-paper test for constitutionally impermissible interrogation has been evolved: neither extensive cross-questioning—deprecated by the English judges; nor undue delay in arraignment—proscribed by McNabb; nor failure to caution a prisoner—enjoined by the Judges' rules;* nor refusal to permit communication with friends and legal counsel at stages in the proceeding when the prisoner is still only a suspect—prohibited by several state statutes. [Citations omitted]

"Each of these factors, in company with all the surrounding circumstances—the duration and conditions of the detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance or self-control—is relevant. [Footnote omitted] The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years—the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. [Citation omitted] The line of distinction is that at which governing self-direction is lost and compulsion,

---

* A form of "cautioning" is now, of course, required by *Miranda.*

of whatever nature or however infused, propels or helps to propel the confession." *Culombe v. Connecticut*, 367 U.S. 568, 601-02, 81 S. Ct. 1860, 1878-79 (1961).

The confession in the instant case was given by a fifteen year old youth who possessed an I.Q. of 76 and a mental age of eight and one half to eleven years, after four hours of police custody and after two and one half hours of questioning. The defendant did receive and did respond to the required *Miranda* warnings before his interrogation. This is not an easy case, but I am compelled to conclude that this defendant did not make a knowing and intelligent waiver of his constitutional rights sufficient to sustain the validity of his confession. I take little comfort from the fact that the *Miranda* warnings were given. I do not believe that this defendant was truly capable, even given the knowledge gained by having heard the warnings recited, of making the free and rational choice which is a prerequisite of a valid confession.

"[W]hen, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age fifteen is a tender and difficult age for a boy of any race. He can not be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. . . .

. . . .

"[W]e are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of 15, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. [W]e cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect

for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain." *Haley v. Ohio,* 332 U.S. 596, 599, 601, 68 S. Ct. 302, 303-04 (1948). Similarly, I cannot indulge in the assumption that a fifteen year old boy of greatly impaired mental ability could, without the aid of counsel or any adult friend, *Commonwealth v. Harmon,* 440 Pa. 195, 269 A. 2d 744 (1970), have the understanding and full appreciation of the advice given him which is the necessary prerequisite of a free and knowing decision to confess. Lending support to this conclusion is the fact that on the few prior occasions when the defendant had had some contact with the police it had been in the context of an informal meeting with the juvenile authorities, following each of which he had been allowed to go home, and the fact that the defendant was held for five days before he was even arraigned. See *Gallegos v. Colorado,* 370 U.S. 49, 82 S. Ct. 1209 (1962).

*Gallegos,* supra, is of further relevance, for in that case the Supreme Court declared inadmissible a confession obtained from a juvenile almost immediately after his arrest, saying:

"The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a fourteen year old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded, and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.

"The prosecution says that the youth and immaturity of the petitioner and the 5 day detention are irrelevant, because the basic ingredients of the confession came tumbling out as soon as he was arrested. But if we took that position, it would, with all deference, be in callous disregard of this boy's constitutional rights. He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—*from someone concerned with securing him those rights*—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14 year old boy would not be able to know, *let alone assert,* such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights." 370 U.S. at 54-55, 82 S. Ct. at 1212-13 (emphasis added). See also *In re Carlo,* 48 N.J. 224, 225 A. 2d 110 (1966) ("... it seems doubtful that these boys ... had the mental capacity, particularly in the environment of a police station, to appreciate the extent of their rights and the consequences of a failure to exercise them. We do not think that these admonitions by the police should be given significant weight in our determination of voluntariness.") ; *In re Medina,* 63 Cal. Reptr. 512 (1967).

It seems evident that this case is cut from the same cloth as *Haley* and *Gallegos,* and that it cannot be said that this defendant was capable of deciding to waive the advice of counsel and to confess to the crime

without first receiving advice and guidance from some friendly adult source, either counsel or an adult friend.

I do not attempt to delineate any specified age, or I.Q. or combination thereof, below which a confession will *automatically* be found involuntary even though the *Miranda* warnings have been given. I prefer an approach that takes into account all the circumstances surrounding the youth's alleged waiver, and examines those circumstances for evidence of voluntariness. Here, Darden deserves more protection than that given by a cold recitation of the *Miranda* warnings.

## II.

I must also dissent from that portion of the majority's opinion which approves of the numerous testimonial references to the defendant's prior juvenile contacts which were solicited by the Commonwealth from certain prosecution witnesses. The Commonwealth asserts that these questions were not, as the defendant claims, a deliberate attempt to show that the defendant was a "bad boy," but were designed to demonstrate that the testimony of these men with regard to the defendant's condition on the night of his arrest, including the question of defendant's relative sobriety, took added validity from the fact that they could assess the defendant's condition from the perspective of having known him fairly well. While I agree that the testimony was arguably relevant for this reason, I cannot believe that its use was sufficiently important to counterbalance our strong policy against the introduction of evidence concerning prior unrelated crimes. As we have made clear in the past, such evidence is inherently prejudicial and generally inadmissible. *Commonwealth v. Burdell,* 380 Pa. 43, 110 A. 2d 193 (1955); *Commonwealth v. Williams,* 307 Pa. 134, 160 Atl. 602 (1932). And it is my opinion that this general rule of

inadmissibility is even stronger when the prior criminal contacts were juvenile offenses in view of the specific statutory proscription of the subsequent use of a juvenile record. Act of June 2, 1933, P. L. 1433, 11 P.S. §261. I cannot conclude that the relatively slight importance of this testimony was at all sufficient to overcome the strong policy favoring its exclusion.

Accordingly, I dissent.

Mr. Justice JONES joins in Part I of this dissent.