In the Matter of the WELFARE OF
S. W. T.

In the Matter of the Welfare of N.
R. S.

Nos. 47600, 47601.

Supreme Court of Minnesota.

March 16, 1979.

508

William R. Kennedy, Hennepin County Public Defender, Gerard W. Snell, Gary McGlennen, Catherine L. Anderson, Robert T. Dolan, Asst. Public Defenders, Minneapolis, for appellants.

Gary W. Flakne, County Atty., Vernon E. Bergstrom, Chief, Appellate Division, David W. Larson and Lee W. Barry, Asst. County Attys., Minneapolis, for respondent.

Heard before ROGOSHESKE, SCOTT and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

This is a combined appeal, pursuant to Minn.St. 260.291, subd. 1, by two juveniles, S. W. T. and N. R. S., from an order of the Hennepin County District Court, Juvenile Division, determining after a joint hearing that appellants committed delinquent acts, aiding and abetting manslaughter in the second degree, in violation of Minn.St. 609.-205(1) by shooting a rifle across the Mississippi River, causing the death of a young man on the other bank. We affirm as to N. R. S., reverse as to S. W. T., and remand.

The issues raised on appeal are: (1) whether the juvenile court erred in denying S. W. T.'s request for a competency hearing; (2) whether the confessions of S. W. T. and N. R. S. were admissible; (3) whether a joint hearing was appropriate in this case; (4) whether an adult standard of care should be applied in juvenile proceedings for criminally negligent manslaughter; (5) whether these juveniles could be convicted of aiding and abetting a criminally negligent act; and (6) whether the evidence was sufficient to sustain the findings of delinquency.

The incident from which the charges arose occurred on September 22, 1976. At about 10 a. m. on that day, Joseph Antrim, Lawrence Anderson, and Dale Jerry, all age 18 or 19, arrived at Hidden Falls Park, on the St. Paul bank of the Mississippi River. After drinking beer for about an hour, they observed two boys descending the hill on the opposite side of the river. While talking with the boys, they learned that the boys had a rifle. Anderson asked to hear the boys shoot it, and the boys proceeded to fire a number of shots into the middle of the river at such an angle that the bullets ricocheted off the water and into the trees above and behind the adults. At one point, Antrim placed a can 30 to 50 feet to the right of his party for the boys to use as a target and reported the accuracy of the shots to the boys. During this time, Dale Jerry was skipping rocks and did not converse with the boys.

The entire substance of the conversation between the boys and the adults is not clear from the record, but Antrim testified that his group had cautioned the boys not to shoot toward them. After 10 minutes of shooting, the adults decided to leave because the boys seemed to be shooting carelessly. After informing the boys that they were leaving, the adults walked 20 feet up a sandy incline toward their van, which was parked on the River Road among some trees. As Anderson and Antrim got into the van, they heard another shot and then

heard Jerry say, "They got me." They helped him into the van and rushed him to a hospital, where he died following surgery.

The police were alerted at around 11:30 a. m., and approximately 25 police officers proceeded to search the riverbank. During their search they found footprints, a .22-caliber rifle buried in the sand, slugs, a beer can which had been shot at, and a chili can. After following the footprints and searching for about 4 hours, the officers found two 12 year old boys, S. W. T. and N. R. S. The officers did not place the boys under arrest because of the variance between the descriptions the officers had received and the boys' appearance, but there were sufficient similarities to ask the boys to accompany them downtown to talk to juvenile officers.

N. R. S. was taken to the juvenile division of the police department at about 4:00 p. m. and was left alone in a holding room until 5:30 p. m., when Lieutenant Schonnesen took him to an interrogating room. There Schonnesen read a *Miranda* warning to N. R. S. and his mother. After asking N. R. S. and his mother if they understood the rights, Schonnesen proceeded to question N. R. S. and elicited a statement from him in which he stated that he and S. W. T. had skipped school, taken a gun from S. W. T.'s father's closet, and had gone to the riverbank. They were shooting at a culvert when three people across the river asked them to shoot at a can. Both boys shot at the can several times and saw the adults leaving, but they had not known that a shot had hit anyone. N. R. S. indicated that they then walked downriver and began shooting at another culvert and ate some lunch. He said that later he accidentally shot the gun in the direction of a fisherman, who then shut off his engine, ducked down in the boat, and finally got to shore and lay beside his boat. Believing that the shot might have hit this man, the boys buried the gun and ran. He stated that they were caught by a policeman a short time later.

S. W. T. was also taken to the juvenile division about 4:00 p. m. and left in a holding area until 5:30 p. m., when Officer Seliski took him to be fingerprinted. Sometime between 6:00 and 8:00 p. m., Officer Seliski interviewed S. W. T. in the company of his parents. Officer Seliski testified that he told the parents that a person had died, that he did not know whether it was an accident, and that their son was a suspect. However, S. W. T.'s mother testified that she and her husband were given to believe that the police thought it was an accident and that the boy could go home if he talked with the police. After being advised according to *Miranda,* the parents stated that they understood the rights, and S. W. T: nodded his head, indicating that he did. Seliski then proceeded to elicit a statement in which S. W. T. indicated that he hadn't known that they had hit one of the three young adults with whom they had been talking. He stated that after the men left they had eaten a can of chili and had continued their shooting. He admitted that at one point he had shot at a tugboat and that at another point N. R. S. had shot at a fishing boat. He said that after this man jumped out of the boat and lay on the ground on the other side of the river, they buried the gun and ran.

The following day delinquency petitions were filed against both juveniles, charging them with aiding and abetting manslaughter in the second degree in violation of Minn.St. 609.205(1). On October 4, 1976, a joint trial was ordered over objection of both counsel for the boys. At that time the court was advised of Dr. James Gilbertson's evaluations of S. W. T. and N. R. S.

Counsel for S. W. T. filed a motion on October 28, 1976 to stay the adjudicatory hearing on the ground that S. W. T. was incapable of understanding the proceedings and participating in his own defense. This motion was heard by a referee of the juvenile court on November 1, 1976, immediately prior to the adjudicatory hearing, and denied as untimely, based upon an order entered by the juvenile court on October 4, 1976, requiring "counsel to advise the court by October 15th of any constitutional or pretrial motions or be barred from making any motion which could be raised by then."

Immediately thereafter, the joint adjudicatory hearing of N. R. S. and S. W. T. began before the referee. The state's evidence consisted, in part, of the testimony of Mr. Anderson and Mr. Antrim, both giving descriptions of the boys they had seen, but neither being able to positively identify either appellant. Evidence was admitted establishing that Dale Jerry had been killed by a .22-caliber bullet fired from the seized gun, and fingerprint evidence linked one of the boys to the chili can. No gun, bullets, cartridges, beer can, or chili can was identified at trial or introduced into evidence by the state. The clothing of the boys, a coroner's report, and evidence that the footprints of the boys generally matched those found in the area from which the fatal shots were fired were introduced. The statements of the boys, without which the state could not have obtained convictions, were admitted into evidence over objection. Dr. James Gilbertson, the psychologist, testified that S. W. T. was exceedingly emotionally disturbed, had been having difficulties in school for a period of two years which required special teaching, had a mental age of 8 years, 8 months, and, in Gilbertson's opinion could not understandingly, voluntarily, or intelligently waive his right to remain silent, nor could he participate in his own defense in such a way as to help his case or aid his attorney.

The referee found that both juveniles had knowingly and intelligently waived their *Miranda* rights and that, accordingly, their confessions were admissible. Primarily upon the basis of these confessions, and holding the boys to the standard of care required of 12 year old school children, the referee found that the boys had violated Minn.St. 609.205(1) and, therefore, had committed a delinquent act.

The juvenile court, reviewing the case on the record, ruled that the juveniles' parents had properly waived the juveniles' *Miranda* rights and that an adult standard of care applied to the juveniles' acts. Without addressing the issue of competency, the juvenile court then affirmed the referee's decision. This appeal followed.

1. We address first the issue of whether the trial court erred in denying S. W. T.'s request for a competency hearing prior to undergoing adjudicatory proceedings. On October 28, 1976, counsel for S. W. T. moved to stay the adjudicatory hearing on the grounds that S. W. T. was incapable of understanding the proceedings and participating in his own defense. The motion was to have been supported by evidence from S. W. T.'s psychologist and juvenile detention record. The referee denied the motion as untimely on the basis of an order entered at the omnibus hearing on October 4, 1976, which required "counsel to advise the court by October 15th of any constitutional or pre-trial motions or be barred from making any motion which could be raised by then."

The competency of an accused is generally defined as his ability to understand the nature of the proceedings against him and to participate in his own defense. See, *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Rule 20.01, subd. 1, Rules of Criminal Procedure. Although the general area of competency is usually discussed in connection with adult criminal proceedings, we regard the right not to be tried or convicted while incompetent to be a fundamental right, even in the context of a juvenile delinquency adjudicatory proceeding. Under the circumstances presented in this case, we conclude that it was error for the court to fail to conduct a preliminary evaluation of S. W. T.'s competency to proceed with the adjudicatory phase of the proceedings.

The record indicates that counsel for S. W. T. received a psychological evaluation on September 29, 1976. Copies were furnished to the state and the juvenile court at the omnibus hearing on October 4, 1976. Contained in that report was a statement which raised the issue of competency:

"Given the intellectual and personality liabilities, and inflexibility of this young man, he in no manner comprehends the gravity of the total implications of, nor the total proceedings facing him."

Psychological testing and examination continued until the November 1 adjudicatory

hearing, and counsel intended to introduce additional psychological information amassed during the period from October 24 to October 29.

■ The contents of the original report were sufficient to raise substantial doubt and put the juvenile court and the parties on notice that a potential question would be raised regarding S. W. T.'s competency. While it would have been preferable to move the court at the omnibus hearing to stay further proceedings pending further examination, or to formally advise the court that such a motion was contemplated, the failure to do so does not preclude the assertion of lack of competency. Because the court has a continuing obligation to inquire into a juvenile's fitness for trial where substantial information or the juvenile's observed demeanor raises doubts as to his competency,[1] the juvenile court erred in denying S. W. T. a competency hearing. The uncontradicted opinion of the psychologist was that S. W. T. did not comprehend, nor was he able to participate in, the proceedings. On the record before us we find that S. W. T. was not competent to be subjected to adjudicatory hearing in November 1976. Therefore, we reverse and remand S. W. T.'s appeal.

2. The second and most crucial issue in the case concerns the validity of the juveniles' waiver of their Fifth Amendment privileges against self-incrimination and the admissibility of the confessions. The referee found that each juvenile had made a voluntary and intelligent waiver of his *Miranda* rights. The trial court, after reviewing the recommended findings of the referee, found that it was unnecessary to determine the capacity of either juvenile to voluntarily and intelligently waive his *Miranda* rights. Citing two Pennsylvania cases, *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1975), and *Commonwealth v. Darden*, 441 Pa. 41, 271 A.2d 257 (1970), the court held that a parent or guardian's knowledgeable waiver on behalf of the juvenile is legally sufficient.

■ As the state admitted in its brief at oral argument, the court was in error in so holding. Neither *Darden* nor *Chaney* stand for that proposition.[2] The constitutional privilege against self-incrimination is as applicable in the case of juveniles as it is with respect to adults. *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967); see, *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1947). The rule in the majority of states, including Minnesota, is that the validity of a juvenile's waiver of that privilege is an issue of fact:

"We hold that the determination whether a waiver of rights is voluntary and intelligently made by a juvenile is a fact question dependent upon the totality of the circumstances. The child's age, maturity, intelligence, education, experience, and ability to comprehend are all factors to be considered in addition to the presence and competence of his parents during waiver." *State v. Hogan*, 297 Minn. 430, 440, 212 N.W.2d 664, 671 (1973).

In *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1975), the court modified its *Darden* decisions by referring to its decision in *Commonwealth v. McCutcheon*, 463 Pa. 90, 343 A.2d 669 (1975), holding that absent a showing that a juvenile had an opportunity to consult with an interested and informed parent or adult or counsel before he waived his *Miranda* rights, his waiver will be ineffectual. This per se rule, while recognizing the importance of a consultative role for the parent, did not in any way remove the ultimate decision as to waiver of constitutional rights from the juvenile defendant.

1. Cf., *Drope v. Missouri*, 420 U.S. 162, 179, 95 S.Ct. 896, 907, 43 L.Ed.2d 103, 117 (1975); *Pate v. Robinson*, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815, 822 (1966); *State v. Jensen*, 278 Minn. 212, 215, 153 N.W.2d 339, 341 (1967).

2. *Commonwealth v. Darden*, 441 Pa. 41, 271 A.2d 257 (1970), did not address the question of waiver by a parent or guardian but rather dealt with the validity of a waiver of Darden's own Fifth Amendment rights. The court focused on his understanding of his rights and did not in any way indicate that a parent or legal guardian could intervene and play a part in the waiver decision.

Because the juvenile court felt that the waivers by the parents were sufficient, it did not address itself to the other factors which it was obliged under our cases to consider in determining the validity of a waiver. The referee, however, did consider these factors and determined that both juveniles had knowingly, voluntarily, and intelligently waived their Fifth Amendment rights. We assume that the juvenile court would have agreed with the referee's decision if it had considered the issue, because it did not disagree with the underlying facts. Counsel for the state and for the juveniles requested in oral argument that this court rule on the admissibility of the written statements on the record before the court rather than to remand the case to the juvenile court for this purpose. We find that the record supports the referee's findings that N. R. S. knowingly, voluntarily, and intelligently waived his Fifth Amendment rights. Thus, his confession was admissible.

The confession of S. W. T., however, presents a different situation. The facts which go to competency go also to the validity of a waiver of Fifth Amendment rights. Dr. James Gilbertson, psychologist, testified that S. W. T. was exceedingly emotionally disturbed and that although he was chronologically 12 years old, he was functioning at an intellectual level of 8 years, 8 months, with an I. Q. in the mid-70's. On the basis of tests, interviews, and a review of school records, Dr. Gilbertson concluded that S. W. T. was incapable of understanding or intelligently waiving his Fifth Amendment rights. S. W. T.'s special learning and behavioral problems teacher and his mother concurred in that assessment. The only evidence that he had knowingly, intelligently, and voluntarily waived his rights was the testimony of the police officer that he had read the *Miranda* card to S. W. T. and his mother, pausing after each statement to ask if it was understood, and that S. W. T. had nodded his head each time. The totality of the circumstances compels a finding of error which renders S.

W. T.'s confession inadmissible in the adjudicatory proceeding.

3. Because of our disposition of the proceeding issues, we do not reach the issue of the juveniles' right to separate adjudicatory proceedings.

4. We next consider whether the trial court erred in applying an adult standard of care in juvenile prosecutions for criminally negligent manslaughter. Minn.St. 609.205 defines manslaughter in the second degree as follows:

"Whoever causes the death of another by any of the following means is guilty of manslaughter in the second degree

\* \* \* \* \* \*

"(1) By his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another \* \* \*."

This court further defined "culpable negligence":

"It is more than gross negligence. It is gross negligence coupled with an element of recklessness. It is intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong possibility of injuries to others." *State v. Beilke*, 267 Minn. 526, 534, 127 N.W.2d 516, 521 (1964). *State v. Beilke, supra*, and later cases[3] which have applied the *Beilke* standard in applying Minn.St. 609.205, have done so in the context of adult criminal prosecutions. The issue has not previously arisen in juvenile delinquency adjudicatory hearings.

In the instant case, the referee found that the standard of culpable negligence applicable to delinquency proceedings was one "commensurate with the age, intelligence and experience of the respondents." On review, the juvenile court applied a stricter standard:

"While children are normally held to a different standard of care than adults by

3. *State v. Swanson*, 307 Minn. 412, 240 N.W.2d 822 (1976); *State v. Spann*, 289 Minn. 497, 182

N.W.2d 873 (1970); *State v. Johnson*, 277 Minn. 368, 152 N.W.2d 529 (1967).

reason of their infantile status, nevertheless in dealing with matters of extreme danger to the general public such as guns, children are held to the adult standard of care as a measure of protection for other persons. [citing, *Dellwo v. Pearson*, 259 Minn. 452, 107 N.W.2d 859 (1961)]"

The juvenile court erred in applying this standard. Considerations relevant in establishing the standard of care applicable to a juvenile defendant in a *civil* case such as *Dellwo, supra*—legal recognition of the conduct (e. g., operation of motor vehicles), the hazards involved, the expectations of the general public in encountering the operator, and the facilitation of recovery by the injured party—are not clearly relevant in a *criminal* case.[4] The purpose of a criminal prosecution is a determination of guilt or innocence of the accused and subsequent deterrence and rehabilitation. Further, it is anomalous to premise an adjudication of a child's delinquency on failure to conform his conduct to adult standards. Accordingly, in juvenile delinquency proceedings, the question of culpable negligence must be decided with reference to the conduct and appreciation of risk reasonably to be expected from an ordinary and reasonably prudent juvenile of a similar age.[5]

The juvenile court was in error in applying an adult standard of care to the juveniles in this case. This does not, however, require a new trial. The referee, who had applied the correct standard, concluded that each juvenile had aided and abetted the commission of second degree manslaughter. The juvenile court did not disagree with the facts underlying the referee's conclusion.

5. We consider now the propriety of convicting both juveniles of aiding and abetting a criminally negligent act. Minn.St. 609.05, subd. 1, provides that:

"A person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."

In general, it is held that a person may be criminally liable for aiding criminally negligent manslaughter. While these cases most commonly involve the use of automobiles, several involve firearms. See, e. g., *State v. Asfoor*, 75 Wis.2d 411, 249 N.W.2d 529 (1977).

The concept of multiple liability is applied when several defendants engage in careless activity which results in injury and the principal cannot be identified. *State v. Newberg*, 129 Or. 564, 278 P. 568 (1929), upheld joint convictions of involuntary manslaughter where the prosecution was unable to identify which of the two defendants fired the fatal shot. See, also, *The Queen v. Salmon, Hancock, and Salmon*, 6 QB 79 (1880), which holds that common participation in careless firing of a rifle made all three defendants liable for manslaughter.

Both juveniles admitted skipping school and shooting the rifle at various targets, including shooting across the river near the three adults. Apparently, neither attempted to dissuade the other, and the evidence indicated that both of them acted together with conscious disregard of a risk which reasonable children of their ages would have appreciated. Under the circumstances, it was reasonable to conclude that they both aided and abetted the commission of the offense.

6. Lastly, appellants argue that the evidence was insufficient to prove the delinquency petitions charging criminally negligent manslaughter. To be sufficient in an adjudication of delinquency, the evidence must establish the truth of the petition "beyond a reasonable doubt." *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

---

4. We emphasize that we do not decide the standard of care applicable in *civil* cases involving juvenile misuse of firearms. See, generally, 47 A.L.R.3d 620.

5. This standard should include consideration of factors such as mental retardation, emotional disturbances, etc., which would reduce the juvenile's mental or emotional age below his chronological age.

Under the circumstances of this case, the sufficiency of the evidence depends primarily upon the admissibility of the confessions and the applicable standard of culpability. With regard to the latter, we believe that the evidence supports the referee's conclusion that the juveniles' actions were culpably negligent, even when measured according to a reduced expectation of care. Here, culpable negligence was established not only by reference to the incident in question but to a subsequent incident the same day. A man, conducting a fishing survey by boat for the Department of Natural Resources, was forced to take cover by dropping to the floor of his boat when he heard gunshots and a bullet struck the water near his boat. Significantly, both confessions explained that the juveniles' apprehensions that the man in the boat had been shot caused them to bury the rifle and flee.

The remaining question of the sufficiency of the evidence is intimately associated with the evidence contained in the juveniles' written admissions. The confessions were critical to establishing the prosecution's case. Without them, the charge on which the petitions were based was not proved beyond a reasonable doubt. No witness was capable of identifying the juveniles as the parties involved in the shooting. The articles discovered by the canine search, including the rifle, could not be connected to the juveniles except for one fingerprint on a car. Although the rifle was identified as the source of the bullet found lodged in the victim, the juveniles' confessions were the only evidence introduced regarding the ownership of the rifle.

Affirmed as to N. R. S., reversed as to S. W. T., and remanded.