424 A.2d 1380

**In re William Christopher CURRY.**

**Appeal of William Christopher CURRY.**

Superior Court of Pennsylvania.

Submitted Dec. 6, 1979.

Filed Jan. 30, 1981.

Charles J. Aliano, Montrose, Susquehanna, for appellant.

Raymond C. Davis, Montrose, Susquehanna, for appellee.

Before BROSKY, WICKERSHAM and ROBERTS, JJ.*

BROSKY, Judge:

Appellant, William Christopher Curry, age 15, was found delinquent by the trial court following a determination that he had committed two burglaries in December of 1978. Testimony came from several victims of the burglaries, however, no person made reference to or identified the appellant. State police officers testified about conversations they had with Curry which connected him with the offenses. The interview conducted by the police was held without the parents of appellant or other person in a guardianship relationship or attorney or any other person to guide or assist Curry during questioning. Appellant argues he was denied his constitutional right against self-incrimination and

* Justice Samuel J. Roberts of the Supreme Court of Pennsylvania is sitting by designation.

his right to receive assistance of counsel. U.S.C.A.Const. 5th and 6th Am.

We reverse and discharge the defendant.

The waiver of *Miranda* rights has been discussed in 49 Temple Law quarterly (1975) at page 704:

One of the most controversial and perplexing questions generated by the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), concerns the capacity of a juvenile defendant, without assistance, to knowingly and intelligently waive his fifth amendment privilege against self incrimination. . . . Page 705. Recent psychological studies compel the conclusion, however, that juveniles cannot fully appreciate or effectively assert their constitutional protections. These studies suggest that children possess an "irrational" obedience to authority; when confronted with the "over-powering" presence of the law, "the passive and inexperienced minor is more likely to comply with the requests of the authority, rather than display an uncooperative attitude by refusing to speak. It is suggested, therefore, that in order to assure a constitutional valid waiver, the juvenile should be permitted to consult with a mature and experienced parent or other friendly adult before making this critical decision."

In 1975, the Pennsylvania Supreme Court was called upon to determine whether such friendly adult advice is required as a matter of law before a valid waiver can be effected. Expanding upon its holding one year earlier in *Commonwealth v. Roane*, 459 Pa. 389, 329 A.2d 286 (1974), the court in a series of cases, *Commonwealth v. Smith*, 465 Pa. 310, 350 A.2d 410 (1976); *Commonwealth v. Stanton*, 466 Pa. 143, 351 A.2d 663 (1976); *Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698 (1975); *Commonwealth v. Webster*, 466 Pa. 314, 353 A.2d 372 (1975); *Commonwealth v. Riggs*, 465 Pa. 208, 348 A.2d 420 (1975); *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1975); and most notably in *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975), clearly established such a per se rule.

The court had not expressly ruled on Miranda's applicability to juvenile defendants in Pennsylvania until 1970. Then, in *Commonwealth v. Darden*, 441 Pa. 41, 271 A.2d 257 (1970), it acknowledged that *Miranda* applied and adopted the "totality of the circumstances" test to determine the validity of the juvenile's fifth amendment waiver. One year later in *Commonwealth v. Moses* [*Moses*], 446 Pa. 350, 287 A.2d 131 (1971), the court reaffirmed *Darden*, specifically rejecting the argument that a juvenile lacks the ability to assert his rights without the advice of a more mature person. Despite repeated and vigorous dissents (by two of the Justices), the court's reliance on the totality test continued unabated until its 1974 decision in *Commonwealth v. Roane*, 459 Pa. 389, 394, 329 A.2d 286, 288 (1974).

The court in *Commonwealth v. Roane*, supra, applied the reasoning found in the United States Supreme Court's decision, *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967):

An important factor in establishing that a juvenile's waiver of his constitutional rights was a knowing and intelligent one would be evidence that, before he made his decision to waive those rights, he had access to the advice of a parent, attorney, or other adult who was primarily interested in his welfare.

*Id.*, 459 Pa. at 394, 329 A.2d at 288; *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). Because *Roane* had been denied the kind of "helpful advice" discussed in *Gallegos*, the court concluded that the Commonwealth had failed to establish that his waiver was knowing and intelligent.

During this questioning, William Christopher Curry gave a statement incriminating himself in the activity for which he was found to be delinquent.

At trial, the court heard testimony of the Pennsylvania State Police Officers who had interrogated Curry. Immediately following that testimony, counsel for appellant moved the court to strike it because neither the boy's mother nor a

representative of Child Welfare was not present. The law is clear that statements made by juveniles under these circumstances are not admissible. Such statements are in violation of their constitutional rights, *Commonwealth v. Roane*, supra.

The rationale for making the presence of an interested adult a prerequisite to an effective waiver of a juvenile's constitutional rights was set forth in *Commonwealth v. Smith*, 472 Pa. 492, 498–499, 372 A.2d 797, 800 (1977), where our Supreme Court said:

> In a series of our decisions beginning with *Commonwealth v. Roane*, supra, we announced that the administering of *Miranda* warnings to a juvenile, without providing an opportunity to that juvenile to consult with a mature, informed individual concerned primarily with the interest of the juvenile, was inadequate to offset the disadvantage occasioned by his youth. The new rule appreciates that the inexperience of the minor affects not only his or her ability to understand the full implication and consequences of the predicament but also renders the judgment inadequate to assess the spectrum of considerations encompassed in the waiver decision. It was therefore reasoned that the impediment of immaturity can only be overcome where the record establishes that the youth had access to the advice of an attorney, parent, or other interested adult and that the consulted adult was informed as to the constitutional rights available to the minor and of the consequences that might follow the election to be made. See *Commonwealth v. Starkes*, supra.

Footnotes and citations omitted.

Reviewing the record of the instant appeal, it is clear that this juvenile did not receive the requisite protections envisioned by our recent decisions.

Raymond Bolcavage, the investigating officer, gave the following testimony:

Q. At the time that you took them into custody, did you have any conversation with their mother?

42

A. Yes.

Q. What was that?

A. She stated for us that we had permission to speak to the individuals and to attempt to clear up the situation if they were involved in any other crimes.

Q. Did you once again advise her of her rights?

A. I don't believe I stated then that she had the right to have an attorney present. She had indicated voluntarily that we could ask them any questions and talk to them about any of the crimes that were committed in the area.

Q. How about County Detective Collier, did he advise her?

A. I'm not aware of it. He may have. We were separated at different times.

Q. Did you advise either Gerry or William Curry of their rights at that time?

A. No, sir, I didn't take any statements from them or ask them anything on any crimes there. Later on when they were staying up to the jail, Gerry Curry had a watch on, a railroad-type watch. We were conducting a search of them before they were locked up and I asked him where he got the watch and he stated that he got it from the Dayton residence but I did not question him at that time.

Q. Did you subsequently question him?

A. The next time I interviewed him was on the 8th of December.

Q. Where did that take place?

A. That took place in the Susquehanna County Jail in the office area of the jail.

Q. Who was present that time?

A. County Detective Collier and myself.

Q. Was any representatives of the juveniles present?

A. No, sir.

Q. Did you try to contact Susquehanna County Child Welfare or a representative from their office?

A. No, I did not.

Q. What did you do then?

A. I took a verbal statement from both Gerry Curry and what crimes he had been involved in.

Q. Will you tell us the statement that you took from them?

By Mr. Kelly:

At this time, Your Honor, I would move to strike the reference that was made to the statement that was made. According to Officer Bolcavage right now the boy's mother wasn't present or Child Welfare wasn't present and the law is clear on the subject that statements made by juveniles without having their parents present are inadmissible and if we cannot resolve that issue on the facts presented so far I would submit that I would like to cross-examine him on this.

We are, therefore, constrained to conclude that the statements of the police officers should have been stricken from the record as well as the statements made by the appellant.

A review of the record clearly demonstrates that without these statements the record would be absolutely barren of any evidence against appellant, and the finding of delinquency should never have been made at the hearing.

Order reversed.

WICKERSHAM, J., files dissenting opinion.

WICKERSHAM, Judge, dissenting:

I dissent.

Testimony developed at the juvenile court hearing of William Christopher Curry (hereafter Chris Curry) developed the following situation.[1]

1. Hearing held February 5, 1979 before President Judge Donald O'Malley of Susquehanna County, Pennsylvania.

In the fall of 1978 a series of break-ins and thefts occurred in the Forest Lake area of Susquehanna County. Guns, money and other valuables were stolen by persons unknown.

One of the many victims to testify was Frank Paul Yenich of Johnson City who was a camp owner at Forest Lake, Susquehanna County. He was at his camp in October 1978 and found "a window broke to a door and the door was open." Various items were missing and he reported the incident to officer Raymond Bolcavage of the Pennsylvania State Police stationed at the Gibson Barracks and a fifteen year veteran doing criminal investigation. (NT 17–18, 38)

On December 4, 1978 Delbert W. Potts, who lives at Forest Lake, was near Mr. Yenich's residence at 4:45 P.M. He saw a motorcycle sitting near a shed with a gas cap off of it and he felt this was "unusual." (NT 31) Mr. Yenich was not at home so Mr. Potts "took a little look around." Inside the shed, squatting down on the floor was a young man he knew named Stewart Robinson. (NT 33) As he left the scene he "met a young fellow walking back toward me," named Chris Curry, the appellant herein. (NT 34)

Officer Bolcavage testified that he appeared at the Curry residence the same day, December 4, 1978, as an investigating officer in these series of fall 1978 Forest Lake burglaries. (NT 38) Trooper Thomas Corbett of the Pennsylvania State Police was also present along with Chris Curry, his brother Gerry Curry, another brother, the boys' mother Mrs. Curry and their grandmother. It was six P.M. They were in the living room of their residence in Forest Lake Township.

Officer Bolcavage explained the *Miranda* rights to Gerry Curry and to his mother and they both understood them he said. (NT 39) He took a statement from Gerry *only* on that occasion. On the same day at the residence of Stewart Frank Robinson, Jr. in Forest Lake Township, and in the presence of Stewart's father, and after full advice and understanding of *Miranda* rights, Officer Bolcavage took a statement from young Robinson. A further interview under identical circumstances was conducted the next day, on December 5, 1978 at the Robinson residence.

In the meantime a vigilante group of Forest Lake Township residents was forming over the series of eight different crimes (NT 44) and the mother of the Curry boys filed a juvenile petition with the District Attorney's Office saying that she could not control her boys any longer and further they had run away from home the night before. (NT 44)

As a result Officer Bolcavage with County Detective Willard Collier took Gerry Curry and Chris Curry into protective custody on December 7, 1978. (NT 43) Mrs. Curry told the officers they had her permission to speak to the boys and to "attempt to clear up the situation if they were involved in any other crimes." (NT 45)

On December 8, 1978 Officer Bolcavage and Detective Collier went to the county jail about 12:45 P.M. and advised the boys separately of their *Miranda* rights and separately took statements from them.

Chris Curry admitted his involvement in the break-in and theft at the Dayton residence and other places. (NT 52)

Chris Curry was 16 at the time of the juvenile hearing and 15 at the time of the criminal activity. (NT 73) He was at the time of said juvenile hearing living at home with his mother and attending school regularly. (NT 71)

By Order of February 6, 1979 Judge O'Malley found Chris Curry to be delinquent and continued the dispositional phase of the case. On April 5, 1979 Chris Curry was placed in the custody of his mother with commitment to a State Institution at Blossburg suspended. It is from the April 5, 1979 order that Chris Curry appeals to this Court through his counsel alleging that he was questioned by law enforcement officers in the absence of his mother and therefore his constitutional rights were violated, and that the incriminatory statement made to the police should not have been introduced in his juvenile hearing.

I would affirm. The rights of Chris Curry were carefully protected throughout and his case has been effectively and gently handled.

46

An uncalled-for reversal under the totality of circumstances here present would only serve to encourage disrespect for the law in this young man. His mother was fully informed at all stages of the case as to her rights and the boy's rights. Her admirable response was to direct her boys to co-operate with the police and tell the truth—which they did upon her advice.

I would affirm the decision of the experienced trial judge below.[2]

2. See *Comm. v. Barnes*, 482 Pa. 555, 394 A.2d 461 (1978), which stands for the proposition that a juvenile must be provided an opportunity to consult with a mature, informed individual concerned primarily with the interest of the juvenile before administering *Miranda* warnings. Such was clearly done in this case.